THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* THOMAS CUROE, Defendant-Appellant.

First District (2nd Division)    No. 79-2306

Opinion filed June 9, 1981.

Lawrence E. Morrissey, of Chicago, for appellant.

Bernard Carey, State's Attorney, of Chicago (Marcia B. Orr, Adrienne Noble Nacev, and Ann L. Benedek, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE PERLIN delivered the opinion of the court:

Defendant, Thomas Curoe, was charged in an indictment with theft and perjury. Following a bench trial, defendant was found guilty of theft and not guilty of perjury and was sentenced to serve 30 months' probation. From that judgment defendant appeals raising the following issues for our review: (1) whether the indictment was barred by the statute of limitations; (2) whether the indictment was void; and (3) whether defendant was proven guilty beyond a reasonable doubt of the offense of theft. For the reasons hereinafter set forth, we reverse defendant's conviction.

The criminal charges brought against defendant arose out of his handling of the estate of Louis Moritz, who died intestate on September 25, 1972. Defendant, an attorney, was appointed administrator of the estate on December 18, 1972. The indictment charging defendant with theft alleged that during the period from December 18, 1972, the date of his appointment, to January 10, 1974, defendant "exerted unauthorized control" over the property of the heirs of Louis Moritz in the amount of $326,000.[1]

At his death, Moritz owned real estate in Chicago, had a large savings account at the Continental bank, owned various stocks and bonds and had substantial quantities of silver coins at his residence. On December 22, 1972, defendant opened a savings account at Continental under the name, "The Estate of Louis Moritz, Deceased; Thomas J. Curoe, Administrator." Defendant was the sole signatory.

The opening balance of the estate savings account was $345,788.75. On December 28, 1972, defendant withdrew from the account $230,000 in

---

[1] Since defendant was acquitted of perjury in filing a false first and final accounting with the probate court on October 1, 1974, we have omitted discussion of evidence that pertains only to that charge.

the form of two cashiers checks. One check, for $5,000, was used to open an estate checking account at Continental. The other check in the amount of $225,000 was deposited directly into defendant's personal account at the First National Bank of Chicago which, prior to December 27, 1972, reflected a balance of $7,266.56. According to defendant, he informed a Continental Bank official, Edward Domke, that he "was going to withdraw a large sum of this and earn higher interest for the estate." Defendant failed to obtain court approval for this transaction and did not advise either the attorney for the estate, James Dolan, or any of the heirs apparent as to what he intended to do with these funds.

On February 2, 1973, defendant withdrew $15,000 from the estate savings account for a cashiers check made payable to himself, which he endorsed and deposited into his personal account on February 5, 1973. On February 28, 1973, defendant received a check for $5,000 in partial payment of the proceeds from the sale of the coins found in Moritz' residence. Defendant endorsed the check and deposited it into his own account. When a check for the balance of $46,670 was received on March 7, 1973, he did the same. Defendant again failed to obtain approval for or advise anyone of the sale or the disposition of the proceeds.

At defendant's request, Continental sold 53 Series "E" United States Savings Bonds and credited the proceeds, approximately $58,000, to the estate checking account on March 22, 1973. Although defendant told Domke (the bank official) that the "heirs want these cashed in," the heirs were unaware of the existence of these assets and had not instructed defendant to dispose of them. The same day defendant wrote a check to himself for $54,000 and deposited it in his own checking account.

Defendant issued five more checks on the estate account made payable to himself, dated March 28, 1973, March 30, April 11, July 27 and January 10, 1974, in the amount of $3,500, $10,500, $9,330, $20,000 and $10,000, respectively. All of these checks except the one dated January 10, 1974, were deposited directly into defendant's personal account at the First National Bank. The last one, which defendant said represented payment for part of his fees as administrator, was deposited into his account at the Northern Trust Company.

In November of 1974 defendant sent the heirs letters informing them how much each was to receive from the estate. During the same month, they received post-dated checks for their respective shares. When several of the heirs attempted to cash the checks, or otherwise determine if the checks would be honored, they were informed that there were insufficient funds in the estate account. Ultimately 11 checks were returned due to lack of funds. As a result, George Raff, an attorney for the estate of an heir who had died, notified the Moritz estate attorney, James Dolan, that the checks had been returned. Dolan, in turn, informed defendant of the

shortage. Defendant told Dolan that "there was a problem" because there "were not sufficient funds in the account to cover the checks." Dolan then advised defendant to consult with an attorney.

On November 8, 1974, a meeting was held at defendant's office regarding the depletion of the estate's assets. Present were defendant and his counsel, the attorney for the estate, Dolan, several heirs and their attorneys and Gerald Schloetter, a representative from National Surety Corporation, which had issued a bond for the estate in the amount of $664,500. One of the heirs' attorney, George Raff, testified that defendant privately admitted to him that he had taken funds out of the estate for the purpose of purchasing farms in Iowa but that he had given promissory notes to the estate to cover all of the withdrawals and could make restitution either in cash or in real estate. Defendant refused to tell anyone else what he had done with the assets, but the State presented evidence that defendant had used the funds to pay premiums on life insurance policies and to make mortgage payments on his Iowa farm property. Between December 28, 1972, and March 15, 1973, defendant wrote checks on his personal account in excess of $368,000.

During the meeting on November 8, 1974, defendant produced promissory notes which he said he had executed each time he had taken money from the estate. At trial he introduced nine promissory notes made payable to "L. S. Moritz Administrator." The dates written on the notes corresponded to the dates defendant diverted funds from the estate. No note was executed for the January 10, 1974, check in the amount of $10,000 because defendant claimed that the check represented partial payment of his fees as administrator. Although defendant testified that his purpose in executing the notes was to confirm his responsibility for and his intention to repay the funds taken from the estate, he kept the notes in the estate filed in his own office, and no one knew of or saw these notes until November 8, 1974.

Each of the notes defendant prepared stated an interest rate of 9% and was payable one year from the date of issuance. Two of the nine notes were repaid on time, but defendant defaulted on the other seven, including the $225,000 note which he said he had executed on December 28, 1972. Defendant did not repay this note, which fell due on December 28, 1973, because the "estate was going to be kept open for another year." Defendant said he did not repay the remaining notes because he "wanted to keep the money working at 9% interest. * * * I thought I would be negligent if I put it in a bank. And I wanted to keep the money working for the heirs."

At trial, defendant testified that his personal assets were more than sufficient to cover his withdrawals from the estate. On November 8, 1974, however, he told Frances Fox, an attorney for one of the heirs, that he

did not have the money to pay the heirs. According to Fox defendant said his personal worth was "in excess of several million dollars" but that he had no assets in Illinois. His assets consisted of real estate in Iowa. Because of the liquidity problem defendant had created in the estate's assets, National Surety agreed to pay the heirs their distributive shares in the event defendant was unable to raise the necessary funds. At the insistence of the heirs who were present, defendant agreed to return to the estate the $16,750 he had received for his services as administrator. This sum was repaid in January 1975.

Ultimately, National Surety paid out over $400,000 in claims. On July 29, 1977, it obtained a judgment against defendant in the amount of $380,157.50 on a promissory note he had signed. In return for an assignment of defendant's interests in land contracts, the surety gave defendant a release and satisfaction of judgment on November 14, 1978. By the time of trial National had recovered only $151,000.

John O'Brien, a reporter for the Chicago Tribune, testified that in May 1976 he had a conversation with defendant regarding the case. O'Brien asked defendant why he had taken money from the estate. Defendant said that "it was for investment purposes." When the reporter asked him "did he think that there was anything wrong in doing that," defendant said he never gave it a thought, that he intended to put every penny back into the fund. O'Brien also inquired if defendant had ever asked the probate court to approve his withdrawals. Defendant answered, "I have given that a thought." Defendant testified that he had never read the Probate Act and did not know until 1975 that withdrawals and investments had to be approved by the court. O'Brien also said that defendant told him that he had invested the money, and that he took the money from the estate because of the interest rate the banks were charging: "Money was tight," was his phrase; and he "intended to put the money back in after it earned a higher rate of interest."

In his own defense, defendant testified that he had executed a promissory note each time he withdrew money from the estate and never intended to permanently deprive the heirs of their inheritance. He admitted that when he wrote the checks for the distributive shares of the estate he knew there were insufficient funds in the estate account to cover them. He issued the checks because he expected that he was going to be paid $450,000 from the sale of some real estate.

On cross-examination defendant stated that at the time he withdrew funds from the estate and signed promissory notes bearing 9% interest he could have borrowed the money from a commercial lending institution directly at 7½ to 8%. When asked why he was willing to pay a higher rate of interest to the estate, defendant said his only motivation was to benefit the heirs: "* * * all these heirs were poor heirs. The banks would only give

them 4½%. I used money—now, I had a lot of assets and I was giving them 9%. I was going to make more money for these heirs. Some of these heirs were living in poverty." Defendant admitted that when he was asked the same question at the grand jury proceedings in December 1976 he answered, "That is a good question. The money was there and I used it. I put in notes and did not go through the normal means of getting a loan." Elsewhere in his testimony defendant stated that he used the assets from the estate for his personal benefit because he was unable to borrow any money on his own account. Defendant knew the estate's assets were protected by a bond. Seven witnesses testified regarding defendant's character and reputation for truthfulness.

Defendant was found not guilty of perjury and guilty of theft and was sentenced to serve 30 months felony probation.

## I

Defendant contends that the indictment charging him with theft was barred by the statute of limitations. Under the terms of section 3—5(b) of the Criminal Code of 1961 (Ill. Rev. Stat. 1975, ch. 38, par. 3—5(b)) prosecution for theft had to be commenced within three years of its commission. Here the indictment was returned on January 10, 1977. The last act of theft alleged by the State was a $10,000 check made payable to defendant dated January 10, 1974. Defendant contends that there was no proof that the check issued that date was the subject of a theft and that prosecution for the remaining alleged acts of theft which occurred outside the three-year limit was therefore barred by the statute of limitations. All but one of the acts took place more than three years before defendant was indicted. Section 3—8 of the Code provides, however, that "[w]hen an offense is based on a series of acts performed at different times, the period of limitation prescribed by this Article starts at the time when the last such act is committed." (Ill. Rev. Stat. 1971, ch. 38, par. 3—8; *People v. Haycraft* (1972), 3 Ill. App. 3d 974, 984, 278 N.E.2d 877.) Proof of defendant's intent at the time he executed the January 10, 1974, check thus determines not only whether he could be found guilty of theft for that transaction but also whether he could be prosecuted for the acts which occurred prior to that date.

Defendant asserts that "there is absolutely not one scintilla of evidence that the January 10, 1974 check was the subject matter of a theft. * * *" Defendant states that the January 10, 1974, check was "clearly a fee and not an unauthorized loan." In support of that contention defendant cites his own testimony and various documents which he introduced into evidence.

Defendant's testimony that he issued the January 10, 1974, check in partial payment of his administrator's fees was impeached in several

material respects. First, no fees were approved by the probate court until May 16, 1974, four months *after* defendant wrote the check. Second, none of the heirs was advised that defendant was paying himself any fees. Third, when defendant was asked why he did not simply apply the fees as a credit against what he owed the estate, he stated that he wanted to let the estate continue to make 9% interest on his "withdrawals." But after the estate's attorney, James Dolan, agreed to give to defendant $2,000 from the attorney's fees which the court had authorized for Dolan, defendant did not write a check on the estate's account for that sum. Instead, he credited it against an "interest" payment he made to the estate.

None of the documentary evidence on which defendant relies in support of his interpretation of the purpose of the January 10, 1974, check is dispositive. The check itself did not indicate for what reason it had been drawn. That it was deposited in defendant's attorney-at-law account does not necessarily mean that it was a fee. Neither the handwritten notation on the deposit slip "F" allegedly for "fee" nor the entry of the figure into defendant's personal cash receipts and expenditures book can be considered independent corroboration of defendant's testimony where both documents were in his sole possession and subject to his revision.

Defendant testified that he included the fee in his 1974 Federal income tax return. That return, however, reflected total, not itemized law income. Moreover, even an itemized list of fees would not have established that the fee had been paid at a certain time. Finally, although defendant acquiesced in the heirs' demand to repay the fees he received as administrator, there is nothing in the record to prove that the check issued on January 10, 1974, was part of those fees.

■■ The evidence presented at trial established beyond a reasonable doubt that the January 10, 1974, check was merely the last in a series of unauthorized withdrawals of estate assets which defendant converted for his personal enrichment. Accordingly, we hold that the January 10, 1977, indictment charging defendant with theft was not barred by the statute of limitations.

## II

■■ Defendant has attacked the validity of the indictment on several grounds. Initially, defendant asserts that the indictment charging him with theft is fatally defective in that it fails to identify the parties named therein as "owners." Defendant cites *People ex rel. Ledford v. Brantley* (1970), 46 Ill. 2d 419, 263 N.E.2d 27, in support of this contention. *Ledford*, however, was overruled in *People v. Gregory* (1974), 59 Ill. 2d 111, 114, 319 N.E.2d 483. Ownership need not be alleged. Moreover, the word "owner" as it is used in the statute defining theft, "means a person, other than the offender, who has possession of or any other interest in the

property involved, * * * and without whose consent the offender has no authority to exert control over the property." (Ill. Rev. Stat. 1971, ch. 38, par. 15—2.) Ten living heirs and the estate of one deceased heir were named in the indictment. Their interest, as heirs, was specifically set forth in the indictment charging defendant with theft. The indictment was not defective in this respect.

Defendant next contends that the prosecutor misled the grand jury into indicting him by not disclosing the purpose of the January 10, 1974, check. Because the issuance of that check was the only act which had been committed within the three-year statute of limitations defendant asserts that "had the grand jury known that the check was in payment of a fee and not a loan, a no bill may have issued by the grand jury."

■■ The predicate for defendant's argument alleging prosecutorial misconduct is that the January 10, 1974, check was a partial payment of his fees as administrator. We have previously rejected that claim and have held that there was sufficient evidence presented at trial to prove that the draft issued on January 10, 1974, was one in a continuing series of theft of funds from the estate. A *fortiori*, the prosecutor could not have been guilty of any misconduct in advising the grand jury that January 10, 1977, was the last day on which defendant could be made to answer for his conduct. See *People v. Linzy* (1979), 78 Ill. 2d 106, 110, 398 N.E.2d 1.

Defendant also contends that the indictment was void because of a defective endorsement. Defendant was indicted on January 10, 1977. The indictment was based upon the prosecutor's unsworn summary of the testimony of four witnesses, including defendant, who appeared before the December 1976 grand jury. The endorsement on the January 1977 indictment lists the names of those four witnesses but not of the assistant state's attorney who presented the case. Defendant argues that the endorsement was not in compliance with the provisions of section 17 of "An Act concerning jurors * * *" that the foreman "* * * shall also, in each case in which a true bill shall be returned into court as aforesaid, note thereon the name or names of the witness or witnesses upon whose evidence the same shall have been found." (Ill. Rev. Stat. 1975, ch. 78, par. 17.) This statute has been construed to be mandatory. *Andrews v. People* (1886), 117 Ill. 195, 199, 7 N.E. 265; *People v. Bladek* (1913), 259 Ill. 69, 70, 102 N.E. 243; *People v. Kingsbury* (1933), 353 Ill. 11, 16, 186 N.E. 470.

Whether there was a violation of section 17 turns, in this case, on the propriety of basing an indictment upon an unsworn summary of testimony offered before an earlier grand jury, an issue we have not yet reached. Even assuming, however, that there was a violation, dismissing the indictment is an extreme step which should not be taken unless defendant demonstrates that he was substantially prejudiced by the form of the indictment. (*People v. Cruz* (1978), 66 Ill. App. 3d 760, 765, 384

N.E.2d 137.) As our supreme court observed in *Cross v. People* (1901), 192 Ill. 291, 301, 61 N.E. 400:

> "The object of the statute is to give notice, (*Scott v. People*, 63 Ill. 508,) to enable the accused to prepare to meet the charge and to prevent surprise. When the same notice is otherwise furnished to the accused in apt time, on behalf of the People, that a witness whose name is not on the indictment will be called, the purpose of the statute is accomplished." See *People v. Hammond* (1934), 357 Ill. 182, 190, 191 N.E. 327.

■■ Defendant has not claimed that the allegedly erroneous endorsement prevented him from learning the names of the persons who appeared before either grand jury, or impeded the preparation of his defense or caused him any surprise at trial. We believe that the extensive pretrial discovery allowed defendants in modern criminal practice virtually ensures that no substantial prejudice can befall a diligent defendant solely because of a defective endorsement on an indictment. For these reasons any arguable violation of section 17 that may have occurred does not warrant dismissal of the indictment.

Defendant's principal objection to the indictment is that it was based upon an unsworn summary of testimony presented to an earlier grand jury and should be dismissed under subsection 114—1(a)(9) of the Criminal Code (Ill. Rev. Stat. 1975, ch. 38, par. 114—1(a)(9)). That subsection provides that an indictment is subject to dismissal if it "is based solely upon the testimony of an incompetent witness." The Committee Comments to this provision state that the subsection is in compliance with existing case law which requires at least one competent witness. It is well settled that an indictment will not be dismissed unless all the witnesses were incompetent or all the testimony upon which it was found was incompetent. (*People v. Jones* (1960), 19 Ill. 2d 37, 41, 166 N.E.2d 1.) " '[I]ncompetent testimony' before a grand jury is only that testimony given by a witness disqualified by law (such as complete mental derangement)." *Jones*, at 42; see also *People v. Creque* (1978), 72 Ill. 2d 515, 522, 382 N.E.2d 793.

Defendant does not allege that any of the witnesses who appeared before either grand jury was disqualified by law from testifying, but argues that dismissal under section 114—1(a)(9) is required because there was no "testimony" before the January 1977 grand jury since the prosecutor was not sworn. Defendant cites no authority for this proposition but our own research has disclosed one Illinois case which addresses this issue. In *People v. Whitlow* (1980), 86 Ill. App. 3d 858, 869-70, 411 N.E.2d 1354, the court intimated that a failure to swear a witness before a grand jury would render that witness' testimony "incompetent." The court, however, refused to dismiss the indictment in that case because the transcript of

proceedings before the grand jury did not indicate whether the witness had in fact been sworn, as the State had offered to prove before trial. In the case at bar there is no dispute that the prosecutor was not sworn.

■■ Whether the failure to swear the witnesses appearing before a grand jury constitutes a ground for dismissal of an indictment under subsection 114—1(a)(9) is a question we need not resolve for it is clear that an indictment may be dismissed if it was returned by a grand jury which acted contrary to article 112 of the Criminal Code and which results in substantial injustice to the defendant. (Ill. Rev. Stat. 1975, ch. 38, par. 114—1(a)(5).) Under subsection 112—4(c), not cited by defendant or the State, the foreman of the grand jury "shall preside over all hearings and swear all witnesses." (Ill. Rev. Stat. 1975, ch. 38, par. 112—4(c); see *People v. Clark* (1917), 280 Ill. 160, 166, 117 N.E. 432.) Whether violation of this provision mandates dismissal of the indictment appears to present an issue of first impression in this jurisdiction.

At common law there was a divergence of opinion on whether the failure to swear a witness appearing before a grand jury affected the validity of an indictment subsequently returned by that grand jury. Compare *King v. Bridgewater & Taunton Canal Co.* (1827), 7 B & C 514, and *Rex v. Dickinson* (1819), 1 Russ. & Ry. C.C. 401, suggesting that upon a timely motion, the indictment could be dismissed, with *Regina v. Russel* (1842), 174 Eng. Rep. 492, and *Regina v. Bullard* (1872), 12 Cox C.C. 353, indicating that it was not a ground for dismissal. In *Russel* the court held that the "mode of swearing the witnesses to go before the grand jury would not, if incorrect, vitiate the indictment, as the grand jury were at liberty to find a bill upon their own knowledge merely; and were anciently in the habit of doing so." 4 W. Blackstone, Commentaries 301; 1 Holdsworth, History of English Law 321-23 (1922).

■■ Illinois has retained the grand jury's common law power to indict on the basis of their own knowledge. (Ill. Rev. Stat. 1975, ch. 78, par. 19.) Such an indictment or, more properly, presentment (4 W. Blackstone, Commentaries 301) may be returned only if two or more members of the grand jury provide the information necessary to charge. If the information comes from a single juror, that juror must be sworn the same as in the case of other witnesses. (*People v. Looney* (1924), 314 Ill. 150, 155, 145 N.E. 365.) Because of the veil of secrecy that was drawn over grand jury proceedings at common law, it was seldom possible to ascertain whether the grand jury had acted on unsworn testimony or on the personal knowledge of the grand jurors. Grand jury proceedings, however, are no longer shrouded in the secrecy that prevailed at common law. (*People v. Sears* (1971), 49 Ill. 2d 14, 35-36, 273 N.E.2d 380; *People v. Linzy* (1979), 78 Ill. 2d 106, 109, 398 N.E.2d 1.) In the case at bar, the State does not contend, and we do not find, any evidence that the January 1977 grand jury

indicted defendant on the basis of the personal knowledge of two or more of their members.

Dismissal of an indictment for noncompliance with any of the provisions in article 112 of the Criminal Code is appropriate where it "results in substantial injustice to the defendant." (Ill. Rev. Stat. 1975, ch. 38, par. 114—1(a)(5); *People v. Haag* (1979), 80 Ill. App. 3d 135, 139, 399 N.E.2d 284.) The injustice in subjecting a defendant to a criminal prosecution initiated by an indictment founded upon unsworn testimony was aptly stated in *Switzer v. State* (1909), 7 Ga. App. 7, 10, 65 S.E. 1079, 1081:

> "Unless the oath prescribed by the statute is taken by the witness, his testimony before the grand jury does not amount to evidence, and, if false, would not be a basis upon which perjury or false swearing could be assigned, and an indictment or presentment returned on such alleged evidence would be no indictment or presentment, and should be quashed by the court."

By way of analogy, we note that under section 111—3(b) of the Criminal Code complaints and informations must be sworn. (Ill. Rev. Stat. 1979, ch. 38, par. 111—3(b).) Our supreme court has repeatedly held that there must be strict compliance with the provisions of section 111—3 (*People v. Gilmore* (1976), 63 Ill. 2d 23, 29, 344 N.E.2d 456; *People v. Pujoue* (1975), 61 Ill. 2d 335, 339, 335 N.E.2d 437), including the requirement that the complaint or information be sworn (*People v. Harding* (1966), 34 Ill. 2d 475, 482-83, 216 N.E.2d 147; *People v. Audi* (1979), 75 Ill. 2d 535, 539, 389 N.E.2d 534). The obligation to verify a complaint or information has been held to be mandatory. (*People v. Troutt* (1977), 51 Ill. App. 3d 656, 660, 366 N.E.2d 370.) A defendant may waive his right to object to an unverified pleading (*Troutt; Harding*), but if he does object in a timely fashion the prosecution may not proceed except upon a verified charge. In light of the statutory requirement that complaints and informations be sworn, we believe it would be anomalous if an indictment could be returned solely upon the unsworn representations of a witness appearing before the grand jury. To sanction such a practice would open a veritable Pandora's box of possible evils. No citizen would be immune from the indignities, time and expense involved in defending against a criminal prosecution if the indictment initiating such prosecution could be based on the "testimony" of a person who need not fear suffering the penalties of contempt or perjury for giving false evidence. We do not believe this practice merits our approbation.

That an indictment may be based entirely on hearsay evidence (*Costello v. United States* (1956), 350 U.S. 359, 100 L. Ed. 397, 76 S. Ct. 406) does not, in our judgment, dispense with the requirement that the evidence on which the grand jury acts must be given under oath. In *Hale v. Henkel* (1906), 201 U.S. 43, 65-66, 50 L. Ed. 652, 661-62, 23 S. Ct. 370,

the Supreme Court held that "[w]hile the grand jury may not indict upon current rumors or *unverified* reports they may act upon knowledge acquired either from their own observations or upon the evidence of witnesses given before them." (Emphasis added.) (See also *United States v. Coolidge* (1815), 2 Gall. 364 (F. Cas. 14, 858.) The State, however, points out that the January 1977 grand jury was given a summary of the sworn testimony of four witnesses, including the defendant, who were presented to the December 1976 grand jury. Several Illinois cases have upheld criminal convictions where the indictments were based solely upon the *sworn* testimony of the prosecutor reading the transcript of proceedings before another grand jury. (See *People v. Bissonnette* (1974), 20 Ill. App. 3d 970, 313 N.E.2d 646; *People v. Strauch* (1910), 247 Ill. 220, 93 N.E. 126.) Here the prosecutor was not sworn and did not read the transcript of testimony—he summarized it. The State has cited *People v. Johnson* (1975), 30 Ill. App. 3d 724, 332 N.E.2d 574, in support of the contention that an unsworn reading of testimony presented to another grand jury is permissible. The opinion in *Johnson*, however, does not indicate whether the prosecutor was sworn, but an examination of the briefs in that case suggests that he was not. Nevertheless, *Johnson* is not supportive of the State's argument because the issue there was not whether an indictment could be returned on the basis of an unsworn reading of earlier testimony but whether the prosecutor had improperly attempted to influence the grand jury.

Although our research has not disclosed any Illinois case on point, the propriety of a prosecutor reading or summarizing transcripts of testimony taken before an earlier grand jury[2] has been litigated extensively in the Federal courts. Many have approved the practice of a prosecutor or other law enforcement official reading verbatim the transcripts of sworn testimony presented to an earlier grand jury. (See *United States v. Wander* (3d Cir. 1979), 601 F.2d 1251, 1260; *United States v. Chanen* (9th Cir. 1977), 549 F.2d 1306, 1311; *United States v. Blitz* (2d Cir. 1976), 533 F.2d 1329, 1344-45; *In re May 1972 San Antonio Grand Jury* (W.D. Tex. 1973), 366 F. Supp. 522, 533.) The opinions in these cases do not always indicate whether the prosecutor who read the transcripts was under oath. In the case at bar, however, the prosecutor did not read verbatim the transcript of testimony taken at the December 1976 grand jury. Instead, he summarized the testimony.

Several Federal courts have criticized the use of summaries or excerpts on the ground that the grand jury may not be given a fair summary of what actually transpired before the earlier grand jury. (*United States v. Mahoney* (E.D. Pa. 1980), 495 F. Supp. 1270, 1275-76;

---

[2] See Annot., 59 A.L.R. 567 (1929).

*United States v. Braniff Airways, Inc.* (W.D. Tex. 1977), 428 F. Supp. 579, 583-84; *In re Grand Jury Investigation of Banana Industry* (D. Md. 1963), 214 F. Supp. 856, 859.) And even those courts that have allowed the use of summaries have done so only where the court found that the prosecutor summarizing the prior testimony was himself under oath. *United States v. Brown* (5th Cir. 1978), 574 F.2d 1274, 1275-77; *United States v. International Paper Co.* (S.D. Tex. 1978), 457 F. Supp. 571, 575-76; *United States v. Carcaise* (M.D. Fla. 1978), 442 F. Supp. 1209, 1212-13.

We have found two cases which present facts similar to the ones in the case at bar. In *United States v. Hodge* (5th Cir. 1974), 496 F.2d 87, 88, the Fifth Circuit Court of Appeals ordered the dismissal of a grand jury indictment which had been predicated upon a prosecutor's unsworn summary of testimony presented to an earlier grand jury.[3] In *State v. Grady* (1884), 84 Mo. 220, 224, the Supreme Court of Missouri held that on a motion to quash an indictment a defendant was entitled to introduce evidence that no witnesses testified before the grand jury that indicted him. The defendant sought to prove that the grand jury had acted on the recommendation of the prosecuting attorney who was not under oath and who had advised the grand jury that a former grand jury had investigated the facts but by accident had failed to return an indictment.

■■ We believe that the indictment in the instant case should have been dismissed by the trial court because it was based upon an unsworn summary of testimony offered before a different grand jury. For that reason defendant's conviction for theft must be reversed. Normally, this conclusion would make it unnecessary for us to reach defendant's argument regarding the sufficiency of the evidence. We believe, however, that the reasoning in *People v. Taylor* (1979), 76 Ill. 2d 289, 391 N.E.2d 366, requires us to address defendant's argument.

In *Taylor* our supreme court held that "[w]hen an appellate court reverses a criminal conviction and remands the case for a new trial without deciding defendant's contention that the evidence at the first trial was insufficient, we believe the court risks subjecting the defendant to double jeopardy." (*Taylor*, at 309.) Quoting from the United States Supreme Court's opinion in *Burks v. United States* (1978), 437 U.S. 1, 11, 57 L. Ed. 2d 1, 9-10, 98 S. Ct. 2141, 2147, the *Taylor* court noted that " '[t]he Double Jeopardy Clause forbids a second trial for the purpose of affording the prosecution another opportunity to supply evidence which

---

[3] In *United States v. Schlesinger* (2d Cir. 1979), 598 F.2d 722, the Second Circuit Court of Appeals declined to follow *Hodge* on the ground that an indictment may be based on hearsay evidence. The opinion does not indicate whether the assistant United States Attorney who summarized the earlier testimony was himself placed under oath. Nevertheless we do not believe that the admissibility of hearsay evidence before a grand jury eliminates the necessity of swearing the witnesses whether their testimony is based on their own knowledge or on the reports of others.

it failed to muster in the first proceeding. This is central to the objective of the prohibition against successive trials.' " 76 Ill. 2d 289, 309.

■■ In the case at bar, of course, we are not remanding the cause for a new trial. Because of the possibility, however, that the State may seek to re-indict defendant on or before the date the mandate issues in this cause, we believe the logic of the *Taylor* case compels us to consider defendant's sufficiency argument. Not to reach this contention "risks subjecting the defendant to double jeopardy."

The possibility of re-indictment exists by virtue of section 3—7(c) of the Criminal Code (Ill. Rev. Stat. 1973, ch. 38, par. 3—7(c)). Defendant was indicted on January 10, 1977, the last day of the applicable three year period of limitation. (Ill. Rev. Stat. 1973, ch. 38, par. 3—8.) Under section 3—7(c), however, the period within which a prosecution must be commenced does not include any period in which "[a] prosecution is pending against the defendant for the same conduct, even if the indictment * * * which commences the prosecution is quashed or the proceedings thereon are set aside, or are reversed on appeal." (Ill. Rev. Stat. 1973, ch. 38, par. 3—7(c).) "Prosecution" is defined by the Code to include "all legal proceedings by which a person's liability for an offense is determined, commencing with the return of the indictment * * *, and including the final disposition of the case upon appeal." (Ill. Rev. Stat. 1973, ch. 38, par. 2—16.) A case does not reach "final disposition" until the mandate issues. *People v. Chupich* (1973), 53 Ill. 2d 572, 581-82, 295 N.E.2d 1; *People v. McCloskey* (1971), 2 Ill. App. 3d 892, 898-900, 270 N.E.2d 126; *People v. Custer* (1972), 11 Ill. App. 3d 249, 258, 296 N.E.2d 753.

In the event the State seeks to re-indict defendant on or before the date the mandate issues in this cause, that indictment will not be foreclosed by the statute of limitations. "A prosecution under a second indictment after the limitation period had passed is not barred because a prior, though bad, indictment charging the same offense had been returned or filed within the period of limitation." *People v. Hobbs* (1935), 361 Ill. 469, 469-70, 198 N.E. 224. Accord, *Swalley v. People* (1886), 116 Ill. 247, 249-50, 4 N.E. 379; *People v. Buckner* (1917), 281 Ill. 340, 348, 117 N.E. 1023; *People v. Gallo* (1973), 54 Ill. 2d 343, 350, 297 N.E.2d 569.

The sequence of events in *People v. Hobbs* is particularly instructive. Hobbs was convicted twice of embezzlement. The original conviction was reversed because the indictment was deficient. (*People v. Hobbs* (1933), 352 Ill. 224, 185 N.E. 610.) The opinion was announced on April 22, 1933. Within eight days the State re-indicted the defendant. Hobbs moved to quash the second indictment on the theory that it was barred by the statute of limitations. The trial court allowed this motion and the State appealed. In language previously quoted, the supreme court reversed the

trial court's order and remanded the cause for trial. (*People v. Hobbs* (1935), 361 Ill. 469; see also *People v. Zlotincke* (1910), 152 Ill. App. 363, 370-71, (dictum), *rev'd on other grounds* (1910), 246 Ill. 185, 92 N.E. 813.) Because of the possibility of re-indictment and to protect defendant's right not to be placed twice in jeopardy, we now consider defendant's argument regarding the sufficiency of the evidence.

## III

The indictment charging defendant with theft alleged that he knowingly exerted unauthorized control over the property of Louis Moritz' heirs "intending to deprive said heirs permanently of the use and benefit of said property." Defendant contends that the facts and circumstances surrounding his execution of promissory notes "establish unequivocally that the State has failed to prove the requisite intent."

■■ To "permanently deprive" means, *inter alia*, to "sell, give, pledge, or otherwise transfer any interest in the property or subject it to the claim of a person other than the owner." (Ill. Rev. Stat. 1971, ch. 38, par. 15—3(d).) The evidence presented at the trial of this case clearly established that defendant intended to permanently deprive the heirs of the use and benefit of their property. Defendant appropriated assets from the estate and by his own admissions applied them to his own economic advantage. What he gave the estate in return was a series of unsecured, unverified and unwitnessed promissory notes which may or may not have had any value. Within the context of section 15—3(d) defendant, by transferring interests in the estate property and subjecting that property to the claims of persons other than the rightful owners, intended to permanently deprive the heirs of their property.

In finding that the State proved defendant's felonious intent, we do not rely exclusively upon one of the statutory definitions of the phrase "permanently deprive." Guidance may also be found in cases interpreting the elements of the former crime of embezzlement which, as the Committee Comments indicate, has now been subsumed into the theft statute.

Embezzlement consists of the accused's conversion of another's funds in his possession in a fiduciary capacity, and the crime is complete when there is a fraudulent conversion without the owner's consent. (*People v. Riggins* (1958), 13 Ill. 2d 134, 138, 148 N.E.2d 450.) In the instant case defendant, beginning on December 28, 1972, only six days after he was appointed administrator and continuing until January 10, 1974, withdrew almost $400,000 from the assets of the estate of Louis Moritz and used these funds for his own financial gain. None of the diversions of the estate assets was done with the knowledge or consent of either the probate court or the heirs. Under these circumstances it is

appropriate to conclude that defendant embezzled those moneys and was properly found guilty of theft. Defendant, however, argues that "the records and disclosures made at the time of the occurrence are circumstances which negate felonious intent" and cites *People v. Stevens* (1934), 358 Ill. 391, 405, 193 N.E. 154, for the proposition that "the absence of proof of secrecy and concealment is a circumstance which tends to negative the charge that the accused was actuated by a felonious intent." (See also *People v. Parker* (1934), 355 Ill. 258, 286, 189 N.E. 352.) In our opinion defendant's reliance on this principle is completely unfounded.

No one knew of or saw any of defendant's promissory notes until November 8, 1974, which was almost 10 months after the last withdrawal of money from the estate. The notes were produced only after several heirs had received checks for their distributive shares which could not be cashed because of insufficient funds in the estate checking account. The promissory notes were not executed with any formalities and were kept in the estate file in defendant's own office. In this respect defendant's conduct is similar to that of the defendant in *People v. Schnepp* (1936), 362 Ill. 495, 200 N.E. 338. There the supreme court upheld the embezzlement conviction of a conservator who had deposited a check from the sale of stock into his personal account.

Defendant's production of promissory notes at the November 8, 1974, meeting and his assurances to repay the heirs do not negate his criminal intent (*Riggins*, at 139-40) even if defendant had proven that the notes had been executed contemporaneously with his appropriation of the estate assets (see *People v. Schrager* (1924), 315 Ill. 169, 177, 146 N.E. 151). Defendant's testimony that he had no intention to permanently deprive the heirs of their property is not decisive on the issue of his intent. (*People v. Nevin* (1931), 343 Ill. 597, 600, 175 N.E. 797.) As the court observed in *Spalding v. People* (1898), 172 Ill. 40, 59-60, 49 N.E. 993:

> "A guilty intent is necessarily inferred from the voluntary commission of * * * an act, the inevitable effect of which is to deprive the true owner of property and appropriate it to the defendant's own use. Perhaps in a majority of cases the party who violates his trust in such a manner does not expect or intend that ultimate loss shall fall upon the person whose property he takes and misuses. But no hope or expectation of replacing the funds abstracted can be admitted as an excuse before the law."

Nor does the fact that all of the heirs were ultimately paid their inheritances by the bonding company relieve defendant from criminal responsibility. *People v. Schnepp* (1936), 362 Ill. 495, 499, 200 N.E. 338; *People v. Dean* (1926), 321 Ill. 128, 132, 151 N.E. 505.

Despite our conclusion that defendant was proven guilty beyond a reasonable doubt of theft, his conviction must be reversed because the

indictment was based upon unsworn testimony. For that reason the judgment of the circuit court of Cook County is reversed.

Reversed.

STAMOS and DOWNING, JJ., concur.