THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* THOMAS LUNDBLADE, Defendant-Appellant.

Second District    No. 80-69

Opinion filed April 30, 1981.

Mary Robinson and Paul J. Glaser, both of State Appellate Defender's Office, of Elgin, for appellant.

Daniel Doyle, State's Attorney, of Rockford (Phyllis J. Perko and Marshall Browers, both of State's Attorneys Appellate Service Commission, of counsel), for the People.

Mr. PRESIDING JUSTICE SEIDENFELD delivered the opinion of the court:

The defendant, Thomas Lundblade, was convicted in a jury trial of the offense of deceptive practices (Ill. Rev. Stat. 1979, ch. 38, par. 17—1), and sentenced to three years imprisonment.[1] He appeals, contending that he was not proved guilty beyond a reasonable doubt. Alternatively, he claims that improper argument of the prosecutor deprived him of a fair trial.

Defendant issued a check for $276.81 to a Goldblatt's store on January 18, 1979. The check was drawn on the account of "Thom's Auto Reconditioning" at the United Bank of Rockford. That account was defendant's business account with the bank.

Two witnesses testified for the State. Frank Flowers testified that he was the manager of the Goldblatt store at which defendant cashed the check on January 18, 1979. He recognized defendant on that occasion as an employee at the store some nine years earlier. He authorized the store cashier to cash the check which defendant presented. The check, admitted into evidence, indicates that it was presented twice for payment and returned not paid. Defendant's signature appears on the back of the check with his address and driver's license number.

Roberta Wahlquist, assistant vice-president of the bank, testified that she had served as the personal banker for defendant's personal and business accounts. Defendant opened the business checking account in August 1977. She testified concerning several monthly statements for the months of September 1978 through February 12, 1979, when the account

---

[1] The defendant was found not guilty of a charge of grand theft (Ill. Rev. Stat. 1979, ch. 38, par. 16—1) arising from the same transaction.

was closed, and those statements were admitted into evidence. All of the statements showed an overdraft at the end of each month, except for the November 30, 1978, statement, which showed a $9.16 credit. The credit was made possible through a credit memo to the account in the form of a part of a $5,500 loan from the bank to defendant on November 20. Other than the credit memo, defendant made no deposits in the account after November 20. Wahlquist explained that the $5,500 loan was made pursuant to a November 15 meeting between herself, bank president Roger Bowers, and defendant, because the bank was only advancing $1,000-$1,200 "new money" in hopes of recovering the roughly $27,000 in outstanding loan amounts owed the bank by defendant. Defendant represented that if he received a loan to pay his back rent and utilities he could get back into business and begin repaying the loans.

Wahlquist further testified she was familiar with defendant's business of buying used cars and selling them after reconditioning. On some occasions defendant would write checks to purchase cars and parts for which he did not have funds in his account. Defendant would call the bank and "if we approve the loan over the phone, then, he would be able to write a check and come in next day, sign a note, and bring the information on the automobile." Ms. Wahlquist also stated that the bank's usual practice is to mail overdraft notices to customers, but she did not know firsthand if such notices were mailed to defendant at any time.

Defendant testified in his own behalf that he started his auto repair business in 1977. He testified to various loans he had received from the bank between October 1977 and November 1978. On one occasion in April 1978 he purchased a used Camaro car with a check knowing he had insufficient funds to cover it. The bank later covered the check, and he signed a note to cover the overdraft. The bank also covered his checks, he said, on other occasions. He received no correspondence from the bank during the months of November 1978 through February 1979.

Defendant said that at the November 15 meeting with the bank officers they went over all his accounts but did not suggest closing the business account. He said Roger Bowers told him that he had the bank's full support as long as he pursued his action against his landlord. It was his understanding after the meeting that the bank would continue to honor his checks, although no one at the bank told him that they would do so. However, no bank officer told him that the bank would discontinue honoring overdrafts in the future.

Defendant further testified that he assumed the bank would pay the check to Goldblatt's and that he did not intend to defraud the store. His assumption was based on the stipulation between himself and the bank for the past year and a half in which the business was operated on "a credit basis."

On cross-examination, he stated that he wrote 15 to 20 checks on the account after November 15 and cashed them at neighborhood businesses such as grocery and liquor stores. He understood that the bank would pay those checks. On redirect, he stated that the bank had on several occasions covered checks for which he did not have sufficient funds in his account. He said that on some of the occasions the checks were honored and the bank did not require him to sign a note for the overdrawn amounts.

Roberta Wahlquist testified on rebuttal that the June 1979 loan was a renewal loan and was not "new money." She said that at the November 15 meeting nothing said by her or Bowers implied that the bank would cover future overdrafts. She further stated: "We were very emphatic at that time because of the size of the overdrafts up to that time that the practice not continue." She further said that after the November 15 meeting she never called anyone to indicate that the bank would cover a check drawn on defendant's account. However, on cross-examination she admitted that the bank had cleared over $3,000 worth of checks where the account had insufficient funds before November 15.

In arguing that he was not proved guilty beyond a reasonable doubt defendant primarily contends that he reasonably relied on the bank's practice of paying overdrafts so that his intent to defraud was not established. He also argues that the fact he passed a check to an acquaintance and wrote his correct address on the back of the check disproves any intent to defraud.

The statute makes failure to have sufficient funds or credit with the bank on which the check is draws "prima facie evidence that the offender knows it will not be paid by the depository, and that he has the intent to defraud." Ill. Rev. Stat. 1979, ch. 38, par. 17—1(B)(d).

■■ It is clear from the evidence that the defendant wrote a check to Goldblatt's at a time when he did not have sufficient funds to pay for the check; with a reasonable inference that the defendant knew that he did not have any funds in his checking account at that time. The statute defines "intent to defraud" as meaning "to act willfully, and with a specific intent to deceive or cheat, for the purpose of causing financial loss to another, or to bring some financial gain to oneself. * * *" (Ill. Rev. Stat. 1979, ch. 38, par. 17—1(A)(iii).) Within this definition we conclude that the record is sufficient to raise a question of fact which the jury could resolve against the defendant based on credibility.

If the jury chose to believe the testimony of Wahlquist it could reject defendant's defense that the bank would cover his checks because he had had extensive loans in the past and because they had paid previous overdraft checks. Her testimony was that he had been warned approximately two months prior to writing the check in question that his overdraft checking account practice must cease. The defendant did not

testify that anyone at the bank told him they would cover overdrafts after November 15, 1978. The question of whether or not a defendant has an intent to defraud is one for the trier of the facts to determine upon consideration of all the circumstances in the case, not alone on defendant's declaration of his intent. (*People v. Stills* (1939), 302 Ill. App. 302, 307.) In *Stills*, the defendant also argued that the bank's prior credit arrangement with him disproved his intent to defraud in passing a check with insufficient funds. However, the bank president there testified that prior to the passage of the check in question he had told defendant that the credit arrangement would not continue. Thus the court concluded that the intent to defraud issue was a question of fact for the fact finder as it depended upon the credibility of witnesses. (302 Ill. App. 302, 307.) See also, *People v. Mitchell* (1977), 50 Ill. App. 3d 120, 122; *People v. Everett* (1973), 14 Ill. App. 3d 421, 425.

■■ Defendant has also argued that even if he did not have the credit at the bank, with the result that there would be prima facie evidence of intent to defraud, he had introduced evidence of lack of intent sufficient to overcome the prima facie case. He asserts that his acquaintance with the manager of Goldblatt's and his providing accurate personal information on the check in itself created doubt as to his intent. He relies on *People v. Dennis* (1976), 43 Ill. App. 3d 518. In *Dennis*, the court referred to the act of defendant in giving her correct address when issuing the check in finding that evidence of intent to defraud was insufficient to sustain her deceptive practices conviction. However, in *Dennis* there was evidence that defendant's husband told defendant that he would deposit funds in her checking account prior to the issuance of the check in question and evidence that he did not inform her of his failure to make the deposit. There was further evidence that the store did not present the check to the bank for payment. Thus, the appellate court could properly rely on the conclusion that where the proof was entirely circumstantial and there was a reasonable hypothesis arising from the evidence consistent with the innocence of the defendant it must be accepted. (43 Ill. App. 3d 518, 521.) However, here the defendant clearly knew he had insufficient funds at the time he issued the check and there was substantial proof which negated his claim that he expected to get credit from the bank after the November 15 meeting. Moreover, defendant's account had been overdrawn for approximately a month and a half prior to making the check with no deposit to his checking account in that time. We conclude that under these circumstances the jury could properly find defendant guilty beyond a reasonable doubt.

We are also not persuaded that the prosecutor's closing argument constituted reversible error. The prosecutor referred to "20 victims" to which defendant's objection was overruled. The prosecutor went on to

argue concerning 19 other checks which defendant had cashed after November 15. In reply defense counsel argued that if other victims were existent they could have been called to testify. The prosecutor responded by referring again to the other checks defendant had written which were returned unpaid, labeling defendant's argument as to a lack of testimony of the "victims" of those checks a "red herring."

The claim of error, however, was not raised in the post-trial motion and was therefore waived. *Wilson v. Clark* (1981), 84 Ill. 2d 186. See also *People v. Pallardy* (1981), 93 Ill. App. 3d 725.

■■ We decline to review the issue under the doctrine of "plain error". The jury had the documentary evidence indicating that defendant did issue 15 to 20 checks after November 15 while his account was overdrawn. Defense counsel also pointed out to the jury that none of the payees testified. The real harm to defendant was the evidence of the other checks rather than the use of the label "victims."

We therefore affirm the judgment.

Affirmed.

LINDBERG and HOPF, JJ., concur.