THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
ANTHONY R. MARTIN-TRIGONA, Defendant-Appellant.

First District (4th Division)   No. 80—3104

Opinion filed December 16, 1982.—Rehearing denied January 18, 1983.

JIGANTI, J., dissenting.

Paul Bradley, of Chicago, for appellant.

Richard M. Daley, State's Attorney, of Chicago (Michael E. Shabat and David A. Shapiro, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE JOHNSON delivered the opinion of the court:

Defendant, Anthony R. Martin-Trigona, appeals his conviction for forgery and theft (Ill. Rev. Stat. 1975, ch. 38, pars. 17—3(a), 16—1(a)), and raises the following issues for review: (1) whether the court erred in finding him guilty of theft; (2) whether the court erred in failing to dismiss the forgery counts and in finding him guilty of forgery; (3) whether an indictment may be voted by less than a quorum of informed grand jurors; (4) whether the indictment should have been dismissed because of improper conduct by the prosecutors before the grand jury; (5) whether his prior conviction was improperly introduced into evidence; and (6) whether his sentence was based on improper considerations.

We affirm in part and vacate in part and remand, with directions.

Most of the facts in this case are undisputed. In early 1977, defendant decided to construct 14 townhouses on property he already owned in Champaign, Illinois. The real estate was held as a land trust by the National Boulevard Bank and Trust Company. Defendant employed Gene T. Hardwick as architect, and the latter recommended John Wright as contractor. In February 1977, the Bloomington Federal Savings and Loan Association (Bloomington) made a construction loan to defendant of $400,000. The project was insured for $500,000

by the Maryland Casualty Company. The building was partially complete when all but five units were destroyed by fire in June 1977. Defendant decided to complete only the five remaining townhouses, and the construction loan was reduced to 5/14ths of the original amount, $142,500.

The insurance company paid a partial settlement of $60,000 which Wright used to continue the project. Defendant and Wright disagreed on whether or not to accept the insurance company's settlement offer of $327,738. Defendant believed the settlement should be for $345,000, but Wright wanted to settle for the lower amount because of cash flow problems. When Wright discounted the remaining work by $18,362, defendant agreed to sign the proof of loss for $327,738. Wright prepared a change order which represented the amount of money needed to finish the building. He wrote on the document that the net balance due to him was $45,125.75. He gave this document to defendant just before defendant signed the proof of loss.

The insurance company issued a draft for $267,738 which represented the remainder of the settlement, payable to the National Boulevard Bank as trustee for defendant, Bloomington and Wright. Wright picked up the draft in Milwaukee, Wisconsin, and delivered it to defendant in Chicago around November 1, 1977. Defendant directed the National Boulevard Bank to endorse the draft to himself so that he could negotiate it at the closing on the construction loan.

Ralph Sackett, a loan officer at the University Federal branch of Bloomington, prepared the final settlement statement after conversations with defendant and Wright. The $267,738 draft was to be split three ways: Bloomington was to be paid about $150,000, the amount necessary to reduce the mortgage to $142,500; Wright was to be paid $42,342, an amount described as including retainage; and defendant would receive the remainder, $72,433.

Defendant, Sackett, Wright and architect Hardwick attended the closing on November 8, 1977. Wright had not finished the building on that date. A dispute arose between Wright and defendant. Defendant said that he only owed Wright $45,000 because that was the net balance due which Wright had listed on the proof of loss. Wright insisted that he was owed an additional $39,000 for retainage. Ten percent had been held back from each pay-out to Wright to be paid when he obtained a certificate of completion from the architect; Hardwick never issued this certificate. Defendant offered to put the disputed amount into escrow and settle the dispute by litigation. Wright refused this offer and refused to endorse the draft. Bloomington would not settle without Wright's signature on the insurance draft.

After the failure to reach a settlement, defendant typed on the back of the draft "Anthony R. Martin-Trigona, Attorney in Fact for Bloomington Federal Savings and Loan" and "Anthony R. Martin-Trigona, Attorney in Fact for John Wright." Defendant signed his name and had his signature guaranteed at the National Boulevard Bank. Neither Bloomington nor Wright gave defendant authority to sign on their behalf. Defendant deposited the draft in his personal checking account at LaSalle National Bank in Chicago on November 10, 1977.

A $50,000 check dated November 7, 1977, and drawn on defendant's LaSalle account was returned for insufficient funds the first time it was presented. On second presentment, after deposit of the settlement draft, it was paid. On November 23, 1977, defendant requested a wire transfer of $175,000 to defendant's personal account in the Connecticut Bank and Trust Company. Defendant used these funds to purchase a 30-day $115,000 certificate of deposit in January 1978, and later, a 7-day $100,000 bank note. Eventually the money wound up in the account of a New Haven radio station which defendant owned. The parties stipulated that all withdrawals from the LaSalle Bank and the Connecticut Bank were written and authorized by defendant and used by him to make payments on various mortgages or loans.

In December 1977, defendant approached Bloomington about a settlement and filed a lawsuit against it and Wright. Defendant never advised Bloomington or Wright that he had negotiated the draft. In April 1978, when Bloomington discovered that the draft had been cashed, it contacted the Cook County State's Attorney.

Bloomington made a total pay-out on the construction loan of $270,000. When the loan was first made, Bloomington charged $8,000, or two points. This was not reduced when the loan was renegotiated to the amount actually paid. Defendant never paid interest on the loan and never made any mortgage payments. Bloomington instituted foreclosure proceedings, and the property was sold for $115,000. Neither Wright nor Bloomington ever received any proceeds of the settlement draft.

Defendant was indicted on three counts of forgery and four counts of theft. At trial defendant testified that he acted in economic self-defense. He stated that he never intended to defraud or permanently deprive Wright or Bloomington of their share of the proceeds. After doing his own legal research, defendant, a law school graduate, decided that the payees on the settlement draft were tenants in common. His strategy was to gain control of the money, precipitate or file a lawsuit, and let the court decide on the proper distribution of the

proceeds. Defendant claimed that there were defects in the building, that Wright had waived the right to his retainage, and that Bloomington should have reduced the points because the original construction loan was reduced.

On rebuttal, defendant's Federal conviction of mail fraud was received into evidence. And, at the close of this bench trial, defendant was found guilty on all counts and sentenced to the custody of the Attorney General of the United States for three years, the sentence to run concurrently with a sentence imposed by a Federal judge on September 26, 1980. Defendant appeals his conviction.

Defendant's first contention is that the court erred in finding him guilty of theft because he did not intend to permanently deprive Wright and Bloomington of their property. Defendant argues that his endorsement of the draft constituted economic self-defense because Bloomington was billing him for interest every day until the loan was paid. His filing of a lawsuit against Bloomington and Wright in December 1977 was a good faith attempt to settle the dispute. Defendant's signing of the draft in his own name and the deposit of the insurance proceeds in his own accounts showed no intent to hide his actions. His use of the money to pay mortgages and for contract purchases of real estate was the best way to keep the money from depreciating. Finally, defendant argues that his indemnity agreement with LaSalle by which he held himself liable for any money due Bloomington or Wright demonstrated no intent to permanently deprive them of their property.

With regard to intent to permanently deprive an owner of his property, such intent may seldom be proved by direct evidence and therefore must be deduced from acts committed and circumstantial evidence. (*People v. Mays* (1980), 80 Ill. App. 3d 340, 343, 399 N.E.2d 718, 720.) Whether defendant had the requisite felonious intent is a question for the trier of fact, who has the prerogative to believe or disbelieve defendant's testimony. *People v. Campbell* (1975), 28 Ill. App. 3d 480, 484, 328 N.E.2d 608, 612.

In the instant case, the circumstances of defendant's conduct justify the finding that defendant possessed the intent to permanently deprive Wright and Bloomington of the proceeds of the check. Defendant never informed Wright or Bloomington that he had endorsed the check and deposited it in his own personal checking account at LaSalle, he did not have authority to endorse the check as their attorney in fact, and he transferred the funds at LaSalle to another personal account in a Connecticut bank, from which he made payments on mortgages and loans. Therefore, we hold that there was

sufficient evidence to support a finding of guilty beyond a reasonable doubt.

The next issue raised by defendant is whether the court erred in denying his motion to dismiss the forgery counts of the indictment. Modern courts disregard mere technical objections and require only that an indictment fully state the essential elements of the offense charged. (*People v. DePratto* (1976), 36 Ill. App. 3d 338, 341, 343 N.E.2d 628, 630.) Whether an indictment sufficiently charges an offense does not depend on nice attention to technicalities of pleadings or formulistic recital of allegations. (*People v. DePratto* (1976), 36 Ill. App. 3d 338, 341.) An indictment that enables a defendant to prepare his defense and sustain a plea of judgment in bar of any further prosecution for the same offense is sufficient to charge a crime. (*People v. DePratto* (1976), 36 Ill. App. 3d 338, 341.) Not every omission from the allegations of an indictment will prevent it from having the specificity which will enable a defendant to prepare his defense. *People v. DePratto* (1976), 36 Ill. App. 3d 338, 341.

■ In the instant case, count I of the indictment charged that Trigona "with the intent to defraud, knowingly delivered to the LaSalle National Bank, a certain draft *** knowing that said draft and order for the payment of money was endorsed in such manner that it purported to have been endorsed with the authority of the Bloomington Federal Savings and Loan Association and with the authority of John A. Wright and knowing that neither had given such authority ***.'' Counts II and III charged that defendant with intent to defraud, knowingly endorsed the draft in such manner that it purported to have been made by authority of Wright and Bloomington. Each count included a copy of both sides of the draft. We hold that the indictment was sufficient to enable defendant to prepare his defense because it informed him of the charges against him, and that the trial court did not err in denying the motion to dismiss the forgery counts.

■ Defendant argues that the trial court erred in finding him guilty on the forgery counts. He contends that a person commits forgery in Illinois when he makes or alters a document as described in the forgery statute (Ill. Rev. Stat. 1975, ch. 38, par. 17—3(a)). The forgery counts do not allege that defendant made or altered a document; therefore, defendant contends, they do not allege an offense under the statute. Defendant further claims that to sustain a conviction for forgery there must be a false writing with the intent that it shall be received as the act of another party. Defendant contends that since he signed his own name and had his signature guaranteed, he did not

intend that his writing should be received as the act of another party. Defendant cites as controlling authority *Gilbert v. United States* (1962), 370 U.S. 650, 8 L. Ed. 2d 750, 82 S. Ct. 1399, which holds that the endorsing of a check in a representative capacity is not forgery even if the authority to sign for another is misrepresented. We reject defendant's contentions. The Illinois forgery statute differs from the Federal law and provides as follows:

"A person commits forgery when, with intent to defraud, he knowingly:

(1) Makes or alters any document apparently capable of defrauding another in such manner that it purports to have been made by another or at another time, or with different provisions, *or by authority of one who did not give such authority* ***." (Emphasis added.) (Ill. Rev. Stat. 1975, ch. 38, par. 17—3(a).)

Thus, the common law rule of *Gilbert* is inapposite because the Illinois forgery statute specifically prohibits the unauthorized making or alteration of a document. (See *People v. Young* (1974), 19 Ill. App. 3d 455, 311 N.E.2d 609.) We hold, therefore, that the trial court did not err in finding defendant guilty of forgery.

Defendant raises the issue of whether an indictment may be voted by less than a quorum of informed jurors. The grand jury heard evidence on this case between May 1978 and August 1979. On August 3, 1979, 19 jurors were present when the vote to indict was taken. Of the 19, 9 were present on all dates when evidence was presented, and 14 were present when defendant testified on June 27, 1978. Defendant contends that he was deprived of his right to a quorum of informed jurors.

■ A grand jury consists of 23 persons, 16 of whom constitute a quorum. (Ill. Rev. Stat. 1979, ch. 38, par. 112—2.) If 12 of 16 jurors concur that the evidence before them constitutes probable cause, then the indictment shall be returned in open court. (Ill. Rev. Stat. 1979, ch. 38, par. 112—4(d).) In the instant case, the statutory requirements were fulfilled. We reject defendant's argument that reads into the statute a requirement that every juror voting on an indictment must have heard all the evidence. As Judge Learned Hand stated in *United States ex rel. McCann v. Thompson* (2d Cir. 1944), 144 F.2d 604, 607:

"Indeed, the possibility that not all who vote will hear all the evidence, is a reasonable inference from the fact that sixteen is a quorum. Were the law as the relator argues, it would practically mean that all jurors present at the beginning of any case, must remain to the end, for it will always be impossible to tell

in advance whether twelve will eventually vote a true bill, and if they do, who those twelve will be. The result of such a doctrine would therefore be that in a long case, or in a case where there are intervals in the taking of evidence, the privilege of absence would not exist. That would certainly be an innovation, for the contrary practice has, so far as we are aware, been universal; and it would be an onerous and unnecessary innovation."

In our opinion, defendant was properly indicted by a quorum of grand jurors.

Defendant's next contention is that the trial court erred in denying his supplemental motion to dismiss the indictment. He alleges that the following acts of the prosecutor prejudiced him before the grand jury:

(1) On May 23, 1978, George Monaco, an assistant State's Attorney, said that he had asked defendant to come to his office and explain the insurance draft. Although defendant agreed to come the next day, he never appeared.

(2) On May 31, 1978, Bonnie Phemister, an assistant State's Attorney, told the grand jurors that defendant's attorney, Paul Bradley, had moved to quash a subpoena.

(3) On June 1, 1978, Phemister told the grand jurors that she was unable to serve defendant with a subpoena and under Illinois law failure to serve defendant prevented the State's Attorney from obtaining records from Bloomington, the complaining witness.

When a juror asked why Bradley had made no effort to get defendant to testify, Phemister stated that Monaco had contacted defendant to set up appointments which defendant later failed to keep.

Phemister stated that Monaco incorrectly thought that Bradley represented the trust when in fact he represented the beneficiary of the trust, Martin-Trigona, in a motion to quash a subpoena. Phemister stated:

"*** Mr. Bradley indicated that Mr. Martin-Trigona has some kind of a criminal case, appeal or something in Champagne [sic] County and that he has to be in court on that case from time to time, and I want to find out from a State's Attorney in Champagne [sic] County when that case is up again. If nothing else, we can get somebody down in court on that case and serve him the minute he walks out the door because at least we know he has to show up on that case or

risk having a warrant issued if he misses that court date \*\*\* ."

When Phemister stated that defendant had not lived at home addresses given to the State's Attorney, a juror said: "He obviously has nothing to hide. Real easy to get a hold of. Very straightforward."

(4) On September 29, 1978, Phemister characterized the insurance proceeds as "stolen."

Phemister said that the State's Attorney was unsuccessful in a *ex parte* hearing in Connecticut to obtain records from the Connecticut Bank and Trust Company. The bank did not object to sending the records requested, but defendant had intervened. Phemister further stated:

"One interesting point: In the Petition that he filed in Hartford, he stated that he was a resident of Middletown, Connecticut. And I think that will be interesting if he runs for office here in Illinois, for the Illinois voters to know that he is a resident of Connecticut because I thought he was a resident of Lake Shore Drive here in Chicago."

(5) On August 3, 1979, Monaco told the grand jurors that the State's Attorney had filed a petition in Connecticut for bank records. After the court ordered the bank to turn over the records, defendant appealed. Monaco stated that the appeal had been in the Connecticut Appellate Court "for many months. And I'm told it will be there for many more months."

Monaco informed the jurors that the charge against defendant would be forging the names of Wright and Bloomington.

(6) Defendant also found prejudicial the following: Phemister's summary on June 1, 1978 of telephone conversations between herself and Hardwick and Sackett; Phemister's summary on August 24, 1978 of her conversation with Natale Urso of Westerly Broadcasting Company in Rhode Island; and Phemister's September 28, 1978 analysis of bank records.

■ Section 114—1(a)(5) of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1977, ch. 38, par. 114—1(a)(5)) provides that the trial court may dismiss an indictment returned by a grand jury which acted contrary to article 112 of the Code (Ill. Rev. Stat. 1977, ch. 38, par. 112—1 *et seq.*) if the conduct results in substantial injustice to the defendant. (*People v. Haag* (1979), 80 Ill. App. 3d 135, 139, 399 N.E.2d 284, 287.) The burden is on the defendant to show that the prosecutorial conduct complained of resulted in actual and substantial prejudice to him. (*People v. Haag* (1979), 80 Ill. App. 3d 135, 140.) In

the instant case, defendant merely alleges without explaining that the prosecutor's conduct prejudiced the grand jury. We conclude that even if the allegations of misconduct were true, defendant has failed to establish that his due process rights were violated. Therefore, we hold that the trial court properly refused to dismiss the indictment.

Defendant next contends that the trial court erred by admitting into evidence defendant's prior conviction for impeachment purposes. Prior to the trial in this case, defendant was convicted of mail fraud in the United States District Court for the Central District of Illinois, but, on July 16, 1982, that conviction was reversed and remanded for a new trial by the United States Court of Appeals, Seventh Circuit. The court held that "the trial court's failure to conduct an appropriate inquiry into Martin-Trigona's financial ability to retain counsel was reversible error." (*United States v. Martin-Trigona* (7th Cir. 1982), 684 F.2d 485, 490.) Defendant argues that the admission of a prior conviction which is constitutionally infirm under *Gideon v. Wainwright* (1963), 372 U.S. 335, 9 L. Ed. 2d 799, 83 S. Ct. 792, is inherently prejudicial (*Burgett v. Texas* (1967), 389 U.S. 109, 115, 19 L. Ed. 2d 319, 325, 88 S. Ct. 258, 262), and that an infirm prior conviction cannot be used to impeach an accused's credibility. *Loper v. Beto* (1972), 405 U.S. 473, 483, 31 L. Ed. 2d 374, 381, 92 S. Ct. 1014, 1019.

In *People v. Miller* (1975), 27 Ill. App. 3d 788, 327 N.E.2d 253, defendant argued that it was error to use a conviction, subsequently reversed, to impeach him. The court addressed the issue of "[w]hat result obtains when a conviction which is pending on appeal at the time of trial, but is reversed *after* the conviction, has been used for impeachment purposes?" (27 Ill. App. 3d 788, 791.) The *Miller* court held that where the prior conviction was not void at the time of its introduction into evidence, it does not constitute reversible error for the State to utilize the conviction for purposes of impeachment even though the prior conviction is later reversed on appeal. 27 Ill. App. 3d 788, 792.

■ The word, "void" has been defined as having no legal force or binding effect. (Black's Law Dictionary 1411 (5th ed. 1979.) Defendant's Federal conviction was voidable, capable of being declared void rather than void because on remand defendant could be found guilty in a new trial. Therefore, we hold that it was not reversible error for the State to use the Federal conviction for impeachment purposes. Furthermore, as discussed above, there was sufficient substantive evidence from which the trier of fact could infer that defendant was guilty of the offenses alleged.

■■ Finally, defendant contends he is entitled to reconsideration of his sentence because the trial judge considered his mail fraud conviction in reaching his decision. Before imposing a sentence of three years to run concurrently with defendant's Federal sentence, the trial judge stated that "the defendant has previously been convicted of a felony, and I'm considering that in my sentence." We agree with defendant. An accused is entitled to a reconsideration of his sentence where the trial court, in imposing the sentence, considered a prior conviction which was later reversed. (*People v. Henderson* (1981), 95 Ill. App. 3d 291, 297, 419 N.E.2d 1262, 1266.) We, therefore, vacate the sentence and remand this cause to the trial court for a new sentencing hearing.

For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed in part and vacated in part and remanded, with directions for a new sentencing hearing.

Affirmed in part and vacated in part and remanded, with directions.

LINN, J., concurs.

JUSTICE JIGANTI, dissenting:

"[T]he use of convictions constitutionally invalid under *Gideon v. Wainwright* [(1963), 372 U.S. 335, 9 L. Ed. 2d 799, 83 S. Ct. 792] to impeach a defendant's credibility deprives him of due process of law." (*Loper v. Beto* (1972), 405 U.S. 473, 483, 31 L. Ed. 2d 374, 381, 92 S. Ct. 1014, 1019.) Martin-Trigona's conviction in the Federal court was reversed because he did not have counsel as required under the holding of *Gideon*.

A trial judge certainly could not have anticipated that the United States Court of Appeals was going to reverse the matter on the grounds that the defendant had no counsel. That is an unfortunate situation, as the *Loper* case points out. (405 U.S. 473, 484, 31 L. Ed. 2d 374, 382, 92 S. Ct. 1014, 1020.) However, the evidence was admitted and the issue is whether that admission was harmless error. In my judgment I cannot say that it is harmless, and consequently I believe that the cause should be reversed and remanded.