THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
STEVEN C. BRENNER, Defendant-Appellant.

First District (2nd Division)   No. 84—2406

Opinion filed August 6, 1985.—Rehearing denied August 20, 1985.

Julius Lucius Echeles, of Chicago, for appellant.

Richard M. Daley, State's Attorney, of Chicago (Joan S. Cherry, Peter D. Fischer, and Timothy W. Heath, Assistant State's Attorneys, of counsel), for the People.

JUSTICE HARTMAN delivered the opinion of the court:

After a bench trial, defendant, a 21-year-old independent commodities broker, was found guilty of both deceptive practices (Ill. Rev. Stat. 1981, ch. 38, par. 17—1(B)(d)) and theft by deception (Ill. Rev. Stat. 1981, ch. 38, par. 16—1(b)(1)), and received a sentence of probation for one year and a $10,000 fine.[1] On appeal, he contends that: he was not proved guilty beyond a reasonable doubt; there was a fatal variance between the charges in the indictments and the evidence at trial; and because this dispute was properly civil, rather than criminal, in nature, his prosecution was a misuse of the criminal justice system.

The indictment for deceptive practices alleged that between August 3 and 15, 1982, defendant:

> *"[W]ith intent to defraud Northwest Commodities, Inc.,* and with intent to obtain control over property and to pay for property, to wit: commodity trading account of said Northwest Commodities, Inc., did issue and deliver a check drawn on the Continental Illinois National Bank and Trust Company of Chicago, Illinois, for the payment of more than one hundred fifty dollars in United States currency, knowing that the said money would not be paid by said Continental Illinois National Bank and Trust Company of Chicago, Illinois, in violation of Chapter 38, Section 17—1—D, of the Illinois Revised Statutes 1981, as amended \* \* \*."* (Emphasis added.)

The indictment for theft by deception charged that between the same dates he:

> *"[K]nowingly obtained by deception, control over a commodity trading account of a value in excess of three hundred dollars, the property of Northwest Commodities, Inc., intending to deprive said Northwest Commodities, Inc., permanently of the use and benefit of said property,* in violation of Chapter 38, Section 16—1—B(1), of the Illinois Revised Statutes 1981, as amended \* \* \*."* (Emphasis added.)

At trial, one key witness testified for the State, a broker working for Northwest Commodities, Inc. (Northwest). Defendant testified on his own behalf. Extensive documentation of the financial transactions which formed the basis of the conviction was introduced as evidence.

The broker, who was a friend of defendant's and had met him while working at another commodities brokerage office, testified that on August 3, 1982, he met with defendant and his fiance so that defendant could open a trading account with Northwest. Defendant

---

[1] He also was acquitted of two counts each of deceptive practices and theft.

completed the necessary forms and gave the witness a $6,500 check to open the account. The check, made payable to Rosenthal and Company (Rosenthal), a firm, that essentially acted as Northwest's principal in a trading relationship, was drawn on a corporate account at Continental Illinois National Bank (Continental) in Chicago. Defendant and his fiance were that corporation's only officers and the only signatories on the account. Defendant's fiance actually signed the check. On the next day, defendant issued a second check from the same account, also payable to Rosenthal, for $7,500. This check also was credited to defendant's trading account, with his assent. The record indicates, however, that at the time this check was issued, the account balance at Continental was only about $600. On August 5, although the checks had not cleared for payment, the witness agreed to place defendant's orders. In this day's trading, defendant essentially broke even, after commission charges. In the meantime, the bank account balance dropped to about $300. On August 6, defendant again placed a number of trading orders with the broker and made a slight profit.

On August 8, when defendant said that he intended to make a major trade, the witness accepted a post-dated personal check for $10,000, drawn on a different bank and payable to Rosenthal, although defendant admitted at trial that this account lacked sufficient funds to cover this amount. Defendant also instructed him to put the $10,000 into the account only if needed; however, this check was neither credited to his trading account nor presented for payment.[2]

On the following morning, defendant called and placed two significant trades in foreign currency. The two men talked several times; another broker at Northwest, who testified only briefly for the prosecution, said that he heard the witness say, "Listen to this, you won't believe what [defendant] is doing now."[3] The witness said that at a certain point, he refused to execute defendant's order to buy more be-

[2]Defendant's motion to strike that portion of the State's brief referring to this check because he was acquitted of the specific charges based on that check is denied. Defendant's intent while issuing the two checks at issue here may properly be inferred from evidence as to the circumstances involving the issuance of another check at about that time. To this extent, such evidence is relevant, and does not involve principles of double jeopardy or collateral estoppel, as defendant alleges. In any event, the evidence relating to the $10,000 check was not crucial here.

[3]Although customer order conversations usually are routinely recorded, the record indicates that Northwest's new office did not yet have recording equipment; however, the State's witness said that he had the other broker listen in to verify the "extremely substantial trade" in an "extremely volatile" market where the total value involved was close to $2 million.

cause defendant was losing too much money already. He stated that defendant never placed a stop-loss order, despite the witness' urgings, and that defendant therefore lost approximately $13,000 on the foreign currency trades. He further denied that defendant ever complained about an alleged minor overcharge for commissions, although the evidence indicates a small adjustment ultimately was made on defendant's behalf.

The State's witness recounted that after he told defendant his account had to be closed out, they discussed defendant's debits of about $25,750 (approximately $11,000 from his early trades, $13,000 from the foreign currency transactions, and the rest from commissions owed). Defendant said that he already had given the witness checks totalling $24,000, he intended to remedy the problem, he needed time to move his money around and he would pay in a few days. On the following day, however, the witness discovered that payment on the checks had been stopped on August 9, of which he informed defendant. Shortly afterward, following a meeting between the witness, defendant and the owners of Northwest, a $5,000 cashier's check was credited to defendant; however, he never paid any more money despite numerous other conversations. Northwest eventually paid Rosenthal the monies owed from the trades at their regular meeting. In February 1983, the witness contacted the police.

Testifying on his own behalf, defendant denied that he ever intended to defraud anyone in these transactions, and said he did not issue the checks intending to stop payment on them. He stated that at the time in question he had the financial capacity to deposit money into his Continental account. The record shows that on August 11 he made a deposit of $6,700 into that account; and that the balance was about $5,800 at the end of that day. He also claimed he had a balance of about $3,300 with E.F. Hutton at the start of August; however, the record indicates that this account had been depleted to almost nothing by the time of the events in question. Defendant claimed a guaranteed deposit of $17,500 on June 1 with another commodities firm. He further testified that he had an agreement with his Continental account officer whereby the bank would notify him if he was overdrawn, and he could cover his checks. Defendant further asserted that he issued the $7,500 check only because his friend had lost the first $6,500 check, and that he placed a stop-loss order which would have cut his losses on the foreign currency trade from $13,000 to about $3,800.

Defendant related that he had a dispute with the Northwest broker about a relatively small amount of commission charges. Because of this disagreement, he told the broker that he was going to stop

payment on the checks he had given him. Defendant admitted that: he later offered to give Northwest the $5,000 cashier's check as partial payment until the dispute was resolved; he offered to pay Northwest an additional $6,000 or $7,000 to resolve the matter; and, claimed he received threatening phone calls. He also admitted initially telling the police that he stopped payment because the broker made an "unauthorized trade," although at trial he acknowledged that the trades were authorized, and that when he issued the checks, "there was no money in [the] account to cover them."

In finding defendant guilty of one count each of theft by deception and deceptive trade practices, and then denying his motion in arrest of judgment, the trial judge made the following statements:

"[T]his Defendant is one of the worst liars I have ever seen in my life on the stand. *** He obviously made a bad trade, obviously he got caught up, obviously he went ahead, and stopped payment on those checks, which he knew both of them he didn't have money in that account, despite what he says on the stand.

He is a liar, he is an out and out liar ***. And then he was smart enough to deposit the money on the 11th, to make it look good. He started out the moment he had his loss, he started out to defraud this company. *** [T]here is no question in my mind that he is guilty in counts one and three, and he pushed it to the limits ***.

* * *

[T]here is no question there was an agency relationship here between the trading companies, namely Rosenthal & Co. as well as Northwest. Now, as far as the checks are concerned there's no question in my mind, and I don't have to take his word for it, there is no question in my mind those checks were worthless. He knew they were worthless.

He prevailed upon his friend *** to start trading for him with the worthless checks and he figured he was going to make it big on the sale of the contracts and then be able to cover it and walk away with his profit. It did not happen that way. It went the other way, and he stuck his good friend *** with the losses."

## I

■ Defendant contends that there was a fatal variance between the charges against him and the evidence at trial as to whether Rosenthal or Northwest was the alleged victim. The evidence at trial,

however, amply supported the circuit court's specific finding that "there is no question there was an agency relationship here between the trading companies *** Rosenthal *** [and] Northwest."[4] The record reveals that, as is common practice in the commodities brokerage business, Northwest was an agent office required to turn over funds to Rosenthal for processing, and also that Rosenthal regularly supervised and met with Northwest to balance accounts. Further, defendant specifically met with Northwest's two owners to discuss the incident afterward, and knew that it was Northwest, not Rosenthal, that ultimately was responsible to Rosenthal for the financial losses here. Especially where, as here, defendant was an experienced broker and was fully cognizant of the nature of the relationship between Rosenthal, Northwest and himself, there was no significant variance between the indictments and the proof as to the identity of the victim of defendant's alleged misconduct. Although the checks in question were made out to Rosenthal, and defendant's statement of account also came from Rosenthal, nevertheless, the documents defendant received clearly stated that Northwest had introduced his business. Under these circumstances, the indictments and proof were in accord. Under the evidence, as the indictments properly charged, the putative victim clearly was Northwest. The indictment sufficiently particularized the offense with which defendant was charged. See *People v. Lutz* (1978), 73 Ill. 2d 204, 383 N.E.2d 171.

## II

■ Defendant next claims that he was not proved guilty beyond a reasonable doubt of deceptive practices and theft by deception, as defined by statute. (Ill. Rev. Stat. 1981, ch. 38, pars. 16—1(b)(1), 17—1(B)(d).) The evidence disclosed that when defendant gave the $6,500 and $7,500 checks to his friend, the Northwest broker, his account at Continental was nowhere near approximating the amount of either check; certainly not the sum of both of them. Defendant's background as a businessman and broker must be considered together with the statutory declaration for deceptive practices, that failure to have sufficient funds is *prima facie* evidence that the offender knows his check will not be paid by the depository. It strains credulity to con-

---

[4]Defendant's motion to strike those portions of the State's brief referring to a reference book on commodities trading because it was not presented as evidence to the trial court is denied. The State did not attempt to improperly supplement the record with additional facts not introduced at trial, and cited the general treatise only as an aid in interpreting the evidence. See *People v. Garrett* (1975), 62 Ill. 2d 151, 339 N.E.2d 753.

clude that he was not fully cognizant that his account was grossly insufficient and that his checks would not be paid; yet, he gave the broker the checks to open a trading account and immediately began trading. Nor is it plausible to conclude that the broker at Northwest would have accepted the checks for such sums for any reason other than that he believed the checks would be honored. Unfortunately for defendant, his trades were ill-advised and in a very short time he lost significant sums of money, not including commissions, either $24,000 if the broker's testimony is accepted, or $15,000 if defendant's testimony, that he placed a stop-loss order, was tenable.

Once defendant became aware of his losses, the evidence demonstrates that he promptly stopped payment on both the $6,500 and $7,500 checks which are the bases of the charges here, as well as on the $10,000 check, although he claimed to have done so as a result of the dispute with his broker over the commission rate and the placement of the stop-loss order. The broker denied the existence of any such dispute, and there is no persuasive evidence lending credence to defendant's charges. Defendant's actions support instead the circuit court's assertion that the dispute was only a fabrication and cover-up designed to extricate him from his situation. Additionally, defendant would not have been justified in stopping payment on all the checks even if there was a *bona fide* dispute; the $215 disputed difference in the commission charges was insignificant; defendant's trading losses unquestionably exceeded the amounts of either check, even if his "stop-order" story is believed; and defendant had opened an account and traded large amounts of money over significant periods of time solely because of the checks he had issued.

Considering that the circuit court legitimately[5] and unambiguously determined that defendant utterly lacked credibility, the clear statutory declaration that failure to have sufficient funds is *prima facie* evidence of intent to defraud and defendant's failure to negate evidence of this fraudulent intent, the record amply supported both the findings of fact and the circuit court's conclusion that defendant committed a deceptive practice with an intent to defraud. See *People v. Lundblade* (1981), 95 Ill. App. 3d 474, 420 N.E.2d 784; *People v. Mitchell* (1977), 50 Ill. App. 3d 120, 365 N.E.2d 185.

■ Defendant claims that at the moments he made and delivered

---

[5]Despite defendant's protestations, there is nothing improper in the trial judge's rejection of his testimony, especially where there were several specific significant errors in his factual testimony, including his admitted prior inconsistent statement to the police.

the checks, he lacked the requisite intent to defraud, and so was not guilty of committing deceptive practices. (See *People v. Ogunsola* (1981), 87 Ill. 2d 216, 429 N.E.2d 861; *People v. Sumner* (1982), 107 Ill. App. 3d 368, 437 N.E.2d 786.) To support this claim, he relies primarily on the circuit court's statement that "the moment he had his loss, he started out to defraud this company" and points out that this loss occurred several days after he issued the checks in question. He further argues that he lacked the requisite intent to defraud because he: had an overdraft agreement with Continental; deposited nearly $6,700 into the account in question on August 11; had sufficient funds in his other accounts to cover his insufficient checks; and, made partial payment and attempts to negotiate the amount owed.

The foregoing assertion must be rejected.[6] Although defendant's argument as to the court's comments has superficial appeal, when taken in context with the court's entire summation, particularly its finding that defendant knew the checks were "worthless" when he wrote them, the isolated statement defendant focuses on here is insufficient to call into question the conclusion that defendant had the requisite criminal intent at the relevant moment. Similarly, the record reveals only that Continental would notify defendant in the event of an overdraft and then give him the opportunity to cover it, and that the bank previously had in fact returned overdrafts. Defendant's belated deposit on August 11 did no more than make his Continental balance sufficient to cover the first check for part of one day. His statement from E.F. Hutton reveals that by August 5 he had already depleted that account, which, in any event, had an opening balance of only $3,300. Assuming, *arguendo,* that the letter written almost two years later, indicating that defendant had $17,500 available to him on deposit at another commodities firm in Chicago as of June 1, 1982, was properly admitted, the circuit court could have decided to discount the value of this document, as the court's comments indicate. Defendant made no move to transfer this money to his deficient Continental account, although he issued the checks on August 3 and 4, and did not stop payment until August 9. Similarly, defendant's tardy attempts to negotiate and make partial payment to Northwest are not dispositive, even if relevant (see *People v. Mitchell* (1977), 50 Ill. App. 3d 120, 365 N.E.2d 185) on the issue of his lack of intent to defraud.

The foregoing evidence did not demonstrate that defendant ever

---

[6]Also rejected is defendant's argument that his order to stop payment on the checks should not subject him to criminal liability, since the basis of defendant's culpability clearly was not merely his action in making a "stop payment" order.

intended to cover the checks, or that he stopped payment as a result of a *bona fide* dispute. (*Cf. People v. Ogunsola* (1981), 87 Ill. 2d 216, 429 N.E.2d 861.) Defendant's arguments contesting the conclusion that he possessed the specific criminal intent necessary to a finding of guilt of deceptive practices was not supported by the evidence. See *People v. Lundblade* (1981), 95 Ill. App. 3d 474, 420 N.E.2d 784; *People v. Mitchell* (1977), 50 Ill. App. 3d 120, 365 N.E.2d 185; *cf. People v. Sumner* (1982), 107 Ill. App. 3d 368, 437 N.E.2d 786.

■ The circuit court's determination that defendant was guilty of theft by deception also was supported by the evidence adduced at trial. The record shows that Northwest had to pay Rosenthal over $20,000 because defendant never paid his trading losses. Northwest permitted him to open an account and trade only because its broker believed the checks defendant had issued were valid. Defendant was aware that his account was insufficient to cover the checks, both when he wrote and delivered them and when they were presented at Continental. Defendant never attempted to deposit or maintain sufficient funds in this account to cover these checks, even if such monies were available to him. The circuit court was entirely justified in concluding that defendant's attempts to put some money into the account, claim a "dispute," and stop payment on the checks were merely efforts to cover himself and his original fraudulent design to open a trading account with worthless checks and then pay for the account with the expected successes from his trading. Further, defendant never offered to make more than partial payment for the losses. Under these circumstances, the evidence was not inconsistent with a finding that defendant was guilty of theft. See *People v. Martin-Trigona* (1982), 111 Ill. App. 3d 718, 444 N.E.2d 527; *People v. Curoe* (1981), 97 Ill. App. 3d 258, 422 N.E.2d 931; *People v. Reans* (1974), 20 Ill. App. 3d 1005, 313 N.E.2d 184.

■ Defendant questions this conclusion, again raising the issue of whether he possessed the necessary criminal intent to be found guilty of theft. Albeit defendant may not have expected to lose money in his trading and so did not expect Northwest to lose money permanently because of his deception, he nevertheless gambled with a trading account he obtained without making actual payment; he could not have been concerned with the obvious negative consequences that would befall Northwest if this not uncommon eventuality came to pass. Under these circumstances, deception was patent. (See *People v. Curoe* (1981), 97 Ill. App. 3d 258, 422 N.E.2d 931.) Given defendant's subsequent acts in stopping payment and never offering to make full restitution, his prior felonious intent for theft by deception properly could

be inferred by the circuit court from these later actions.

■ Defendant's contention that he was not guilty of theft because the commodity trading account did not have a value of over $300 is specious. The argument that the Northwest broker opened the account and began trading "voluntarily" only on the basis of his relationship as defendant's friend and former co-worker is equally unfounded.

### III

■ Although this matter culminated in a criminal prosecution, it cannot be concluded that Northwest abused the criminal process, as defendant urges. The mere existence of a possible civil cause of action does not bar criminal prosecution for the same misconduct.

For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

STAMOS, P.J., and PERLIN, J., concur.