**PACKERS TRADING COMPANY,**
**Petitioner,**

v.

**COMMODITY FUTURES TRADING**
**COMMISSION, Respondent.**

. **No. 91–3107.**

United States Court of Appeals,
Seventh Circuit.

Argued May 27, 1992.

Decided Aug. 7, 1992.

Rehearing and Rehearing In Banc
Denied Sept. 29, 1992.

Michael J. Garvey, argued, Baker & McKenzie, Chicago, Ill., for Packers Trading Co., Inc.

Jay L. Witkin, James T. Kelly, Obren V. Barnes, John Nolan, Victor L. Reid, argued, Joanne T. Medero, Commodity Futures Trading Com'n, Office of the General Counsel, Washington, D.C., for Commodity Futures Trading Com'n.

Before BAUER, Chief Judge, RIPPLE, Circuit Judge, and WOOD, Jr., Senior Circuit Judge.

HARLINGTON WOOD, Jr., Senior Circuit Judge.

In defending its opinion and order entered in a reparation proceeding [1] against

---

1. The reparation proceeding was conducted under Section 14 of the Commodity Exchange Act, 7 U.S.C. § 18. The Commission's opinion and order is dated August 27, 1991.

Respondent's Petition for Review, the Respondent Commodity Futures Trading Commission reminds this court that "the agency's determinations are entitled to a special deference by the reviewing court." *Central Nat'l Bank of Mattoon v. U.S. Dept. of Treasury*, 912 F.2d 897, 904–05 (7th Cir.1990). That is the way it ordinarily should be, but when the Commission asks this court to approve its reparation award in the amount of $14,250 in favor of a confirmed commodities wrongdoer it asks too much. *Central National Bank*, however, has more to say. The amount of deference due an agency decision "depends among other things on the nature of the issue." 912 F.2d at 904. The nature of the issue benefits from but does not require for its resolution the Commission's commodity trading expertise. The present issue concerns a type of wrongdoing not uncommon in one form or another in other types of business transactions outside the commodity trading field. If this court must, out of deference alone, approve what the Commission has done in this case, there is little need for this court in the future to exercise its jurisdiction to review Commission actions.[2] The Act provides that "the findings of the Commission as to the facts, if supported by the weight of the evidence, shall ... be conclusive." The Commission had the same record to review as we have, that being the record along with findings developed by the administrative law judge. The administrative law judge dismissed the complaint, but the Commission reversed the administrative law judge and instead awarded reparations in the amount of $14,250 to the complainant. Our review of that record satisfies us that the conclusions of the Commission are not supported by the weight of the evidence.

We shall identify the principal players and briefly explain what happened. The central figure is the complainant Steven Brenner, ostensibly President of D.J. Commodities Consultants, Inc., ("D.J.").[3] He filed a Reparations Complaint as D.J.'s president and its "duly authorized agent" with the Commodity Futures Trading Commission charging Packers Trading Company ("Packers") with a violation of Section 4b of the Commodity Exchange Act, 7 U.S.C. § 6b, the antifraud provisions. Bruce Johnson, who became personally involved, is president of Packers. The complaint alleged the violation occurred in the way Packers handled D.J.'s account in August 1987, allegedly resulting in over $14,000 in damages. The matter was referred by the Commission to an administrative law judge, George H. Painter. It appears D.J. was organized in 1982 by Brenner with his wife as the sole shareholder. It was Brenner, as president and agent of D.J., who placed the trades at issue and was directly involved. D.J. served as a vehicle for Brenner's business activities. Brenner's relationship to D.J., as we shall see, was developed further in a related Commission proceeding. Brenner's calculated and successful efforts to take advantage of an inadvertent mistake by Packers in its handling of certain trades when Brenner should not have been trading at all is the underlying fact situation. Packers and the administrative law judge treated Brenner as the alter-ego of D.J., but the Commission avoids making that determination.

Brenner at the time, but unknown to Packers, had been put on the Commodity Futures Trading Commission sanctions list for failure to satisfy a prior judgment rendered against him in an unrelated reparations case. *Wagner v. Commonwealth Commodities Corporation and Steven Brenner*, CFTC Docket No. 85–R91. He was charged in *Wagner* with churning the account of the complainant which resulted in damages, costs and interest exceeding $6,000. That barred him under 17 C.F.R. § 12.407(c), from trading on or subject to the rules of any contract market. Brenner contended under oath before Judge Painter

---

**2.** The Commodity Exchange Act, 7 U.S.C. § 18(e), Section 14(e), which incorporates 6(b) of the Act, 7 U.S.C. § 9, provides that an aggrieved party may seek review of a reparation order by petitioning the United States Court of Appeals for the circuit in which the hearing was held.

**3.** D.J. and Steven Brenner, its president, are parties to this appeal.

that the *Wagner* reparation judgment had been fully satisfied and that he was therefore not barred from trading. As proof he attached a copy of an insurance company draft for $5,000 made payable to Wagner. That draft, however, appeared on its face to settle only a bodily injury claim, a separate claim between Brenner and Wagner. Brenner testified that the insurance company draft also settled the reparations award. However, the *Wagner* reparation award alone exceeded the total of the insurance company bodily injury draft by over a thousand dollars. There is no statement of satisfaction in the *Wagner* reparations judgment. Furthermore, there is an affidavit by Wagner's attorney appearing in this present record which denies that the reparation award had been settled. The administrative law judge did not believe the *Wagner* reparation award had been satisfied. The Commission merely characterized Brenner's testimony as "dubious" and considered it unrelated to the present case.

Brenner has some previous history of trouble as a commodities broker. In a state court bench trial, Brenner, then an independent commodity broker, was found guilty of both deceptive practices and theft by deception, felonies under Illinois law. He received a sentence of probation for one year and a $10,000 fine. The state trial judge described Brenner as "one of the worst liars I have ever seen in my life on the stand," an appraisal shared by the administrative law judge in this case. Brenner's conviction was affirmed in *People v. Brenner*, 135 Ill.App.3d 877, 90 Ill.Dec. 577, 482 N.E.2d 396 (1st Dist.1985).[4]

Before we examine the present dispute in detail, the Commission's view of another aspect of the present controversy should be noted. The Commission's brief states that the Commission is not unmindful of Brenner's violation of the trading ban imposed in *Wagner*, but it explains that the trading ban part of this case is a law enforcement matter to be handled under other commission procedures, not the reparations part of it. Later it was so handled. The Commission brought an administrative enforcement action against Brenner and cites that record in this case. We have examined the enforcement record.[5] That enforcement action resulted in a new trading ban being imposed against Brenner, this time for ten years, and in addition the Commission assessed a civil monetary penalty of $10,000. In that proceeding, which followed the reparations proceeding, Brenner testified under oath that he "controlled" D.J. but was not sure if he actually had an ownership interest in it. Nor was he sure that he was D.J.'s chief operating officer, but he did admit that he manages and makes the business decisions for D.J. He also explained that his wife is also involved in the management of the company and labeled her his "partner." Whatever the business relationship is between Brenner and his wife, no one else is involved in the company. The same administrative law judge, Judge Painter, heard the enforcement action as had previously heard the reparations matter. He noted in his Summary Disposition Order, August 16, 1990, that notwithstanding Brenner's violation of the trading ban entered against him in the *Wagner* reparations matter, Brenner was "not lacking in audacity" when he initiated his own reparation case against Packers.

Packers puts the Commission's adverse reparations judgment in favor of Brenner, and the Commission's administrative enforcement action assessing a monetary penalty against Brenner in perspective. Packers points out that it is being required to pay D.J. over $14,000 for reparations, while Brenner is being assessed a monetary penalty of $10,000 in the law enforcement action. Brenner or D.J., because of Brenner's wrongdoing, is thereby being awarded by the Commission's two rulings a net profit of over $4,000 with Packers in effect paying Brenner's new monetary sanction, thus making the wrongdoing profitable. It is time to see what happened to cause this

---

4. *People v. Brenner*, 90 Ill.Dec. at 880, 482 N.E.2d at 399, sets forth the state trial judge's appraisal of Brenner's veracity.

5. *In the Matter of Steven C. Brenner*, CFTC Docket No. 90–7 (filed March 4, 1990; CFTC opinion and order dismissing Brenner's appeal entered December 11, 1991).

incongruous result, a result no less incongruous even recognizing that Packers itself allegedly committed a violation. After Packers and Johnson discovered what Brenner had accomplished, Johnson resorted to a little self-help to get back the trades from Brenner which he considered to be his.

On August 6, 1987, at 8:36 A.M. Brenner by phone placed an order with Packers for the account of D.J. to buy six September futures contracts of a particular description on the Chicago Mercantile Exchange. A few minutes later at 8:42 A.M. Brenner canceled that order and substituted a new order to buy ten similar September contracts. Shortly thereafter at 8:59 A.M. Brenner called Packers again and canceled the order to buy ten September contracts and reaffirmed a previous order he had placed to sell ten September contracts. Later that same morning at 11:37 A.M. Packers's phone clerk on the floor of the exchange called Brenner to confirm that D.J.'s order to sell ten contracts had been filled as well as his subsequent order to buy six contracts. Brenner expressed surprise about the filling of the order for six contracts and advised Packers's floor clerk he had not given an order to buy those contracts. When questioned by the clerk, Brenner, aware that the fill of the order was erroneous, then changed his position and mischaracterized it as "the order I forgot to cancel." At this time Packers's clerk was unaware that Packers had made a mistake by not canceling Brenner's order as directed by Brenner and had instead mistakenly canceled an order by Packers's president, Bruce Johnson, for his personal account. Brenner was electronically following the market from his home and knew the market was moving favorably. The conversation ended with Brenner accepting the trade to buy the six contracts. The matter of the mistake continued to quickly develop. About four minutes later at 11:41 A.M. Packers's floor clerk again called Brenner and advised him that after checking she had determined that his six contract order had in fact been canceled by him, and therefore it was filled erroneously by Packers. Knowing the market was favorable Brenner advised the floor clerk that rather than reject the mistaken purchases as she had offered he would still accept the six contracts. Hardly ten minutes previously, although well knowing he had in fact canceled the contract, he had first stated to the floor clerk that he had given no such order but changed his story to say he had forgotten to cancel it. He attempted to take advantage of Packers's mistake when Packers was not fully aware of it. At 11:48 A.M. Brenner called back to see if the purchase could be taken from him, and the clerk advised it could not. Brenner did some further trading on that basis. It was not until the following day, August 7, 1987, that Johnson discovered that Brenner's cancellation had erroneously been attributed to his personal account and that Brenner now had the contracts. This was the other side of Packers's mistake resulting in a personal loss to Johnson. This had not been known to Packers's clerk when she advised Brenner he could keep the contracts. Johnson then called Brenner to advise him of the mistake. In this heated conversation Johnson offered in compromise to permit Brenner the benefit of the trades up to the time of Johnson's phone call to Brenner. Brenner refused. It was then that Johnson undertook to straighten out the error by self-help. He told Brenner he was removing the six contracts from D.J.'s account and having the trades credited to his account, and he did.

The administrative law judge noted that in his verified complaint, Brenner, on the damages issue, alleged he did not close out existing positions in his account until Monday, August 10, 1988, because it was only then he learned from Johnson that Johnson was removing the six disputed contracts from his or the D.J. account. This, the administrative law judge found, was contrary to Brenner's testimony in which he admitted receiving the call from Johnson about removing the trades the morning of August 7, not August 10. This time variance had an impact on Brenner's calculation of his damages by raising them due to market changes. As to that part of the case the administrative law judge found

that "[B]renner's calculation of damages in this case is specious and as unreliable as Brenner's testimony." Brenner's damages were claimed to be $14,625.

The administrative law judge also found that Brenner had violated the Commodities Exchange Act by entering the questioned trades when he had failed to satisfy a reparations judgment against him in the *Wagner* matter which banned him from trading. The administrative law judge further found that Brenner traded through the D.J. account "solely to conceal from the exchanges the bar against his trading." The administrative law judge also put the blame on Brenner for his own damages because of the sequence of events. The administrative law judge found that Brenner could have precluded all of this if in his conversations with Packers's floor clerk he had been honest and candid and not deceitful. Instead Brenner tried to take advantage of the mistake.

Because of that trading ban violation, as well as Brenner's false testimony about the settlement of the *Wagner* reparation, the administrative law judge denied Brenner recovery from Packers and dismissed the case. In doing so he referred to Brenner as coming into court with "unclean hands." Were it otherwise, the administrative law judge suggested Packers would have had to make good on its taking the trades back from Brenner.

The Commission on review reversed the administrative law judge and assessed the reparations as sought by D.J. and Brenner. It held that the Commission had never considered whether the unclean hands doctrine was applicable in a reparations case. The Commission did not, however, hold that the doctrine could not be. Assuming arguendo that the defense was available the Commission then proceeded to hold the record did not support the maxim's application. In its brief, however, the Commission now asserts that the unclean hands doctrine may apply to conduct "directly associated with the particular transaction." The Commission cites *Precision Instrument Manufacturing Co. v. Automotive Maintenance Machinery Co.*, 324 U.S. 806,

814–15, 65 S.Ct. 993, 997–98, 89 L.Ed. 1381 (1945); *Washington Capitols Basketball Club, Inc. v. Barry*, 419 F.2d 472, 478–79 (9th Cir.1969), and *Fibreboard Paper Products Corp. v. East Bay Union of Machinists*, 227 Cal.App.2d 675, 39 Cal.Rptr. 64, 97 (1st Dist.1964), as holding that "[t]he unclean hands doctrine, however, can only apply to conduct that is directly associated with the transaction in controversy." Before applying that test the Commission then narrowed the issue to only the removal by Johnson of the six contracts from D.J.'s account. The Commission also disputed the administrative law judge's finding that the damages were caused by Brenner's lack of candor at the time Brenner was trying to manipulate and take advantage of the error. The Commission's view was that because of the timing of the phone calls the administrative law judge's finding was unreasonable and unlikely and therefore constitutes clear error. No matter how that time sequence is viewed, it clearly demonstrates an effort by Brenner to take advantage of the mistake, a circumstance then fully understood only by him. The Commission simply favors the view that when Packers's floor clerk, without full knowledge of the mistake, offered the trades to Brenner and he accepted, then Packers or Johnson was no longer free to remove the trades from the D.J. account. The Commission bases its judgment only on a small portion of the whole transaction, taking it out of context and isolating it from the gross wrongdoing of Brenner which led to the removal of the trades.

The Commission's reading of *Precision Instruments* is too limited. *Precision* does not limit the use of the maxim quite the way the Commission reads it. *Precision* says that the maxim requires that the parties shall have acted fairly and without fraud or deceit in the controversy in issue. *Precision* explains that the maxim applies "to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief, however improper may have been the behavior of the defendant." 324 U.S. at 814, 65 S.Ct. at 997. *Precision* says more. *Precision* explains that the maxim gives wide range to the court's use

of discretion in refusing to aid the unclean litigant. The court, *Precision* further explains, is " 'not bound by formula or restrained by any limitation that tends to trammel the free and just exercise of discretion.' " 324 U.S. at 815, 65 S.Ct. at 997 (citation omitted). One's misconduct which invokes the maxim "need not have been of such a nature as to be punishable as a crime or as to justify legal proceedings of any character." 324 U.S. at 815, 65 S.Ct. at 997. Properly applied, the maxim is to prevent "a wrongdoer from enjoying the fruits of his transgression," and the Court adds in some cases also to avert injury to the public. Those actions of Brenner should be enough to defeat the claim. By his wrongful conduct, Brenner and D.J. manage to make a profit which directly controverts the explanation in *Precision* that the wrongdoer should not enjoy the fruits of his transgression. Using the language of *Precision, supra,* Brenner and D.J. are "tainted with inequitableness" and "bad faith relative to the matter in which he seeks relief." D.J. and Brenner are unclean litigants.

■ The Commission also seems to view Brenner's conduct separate and apart from D.J.'s, which is contrary to the view of the administrative law judge. From this record, as supplemented by the administrative enforcement action, it is naive in these factual circumstances to view Brenner and D.J. as two separate entities. The evidence is clear enough to decide the issue as a matter of law. Brenner controlled the company as a transparent cover to avoid the trading ban. It is hardly reasonable to argue that D.J. is a separate, innocent bystander or that Brenner's wife did not know and approve of the subterfuge. D.J. and Brenner for all practical purposes were one and the same. It is arguable that the Commission itself recognized this in the law enforcement proceeding, but it did not have the benefit in the reparations proceeding of Brenner's admissions. But, it is all here now and part of this record brought to our attention by the Commission. Although earlier in its Reparations Opinion and Order the Commission avoided that conclusion, and it now suggests that the

fact that D.J. had been organized several years before Brenner was originally placed on the sanctions list somehow makes a difference in the "alter-ego" theory.

In *McCracken v. Olson Companies, Inc.,* 149 Ill.App.3d 104, 102 Ill.Dec. 594, 598, 500 N.E.2d 487, 491 (1986), the alter-ego theory is well explained. It applies where it is found that the corporation is merely the alter-ego or business conduit of a governing or dominant personality. Brenner was that. To adhere to the fiction that D.J. as a separate entity, which it is not, is therefore entitled to reparations from Packers so as to benefit from the wrongdoing of Brenner "would promote injustice or inequitable consequence." *McCracken,* 102 Ill.Dec. at 598, 500 N.E.2d at 491. Brenner with his wife possibly as sole stockholder of D.J., or maybe Brenner has a share of D.J. too, he is not sure, or maybe his wife is his partner as he labels her, but whatever the business relationship of Brenner and his wife to D.J., Brenner admittedly was in "control." D.J. and Brenner for business purposes are virtually indistinguishable and should not profit from the wrong of the other.

The Commission also views *Wagner* as a totally unrelated matter thereby separating out the trading ban violation. *Wagner* is unrelated, but the trading ban it imposed is not. The *Wagner* ban carried over directly into this case and was violated by Brenner. *See In the Matter of Steven C. Brenner,* CFTC Docket No. 90–7. The two cases, *Wagner* and this one, are thus directly linked in that important regard. Without Brenner's disregard for the *Wagner* ban this case would not have resulted. But even if the *Wagner* ban and the alter-ego theory are put aside, it is clear that Brenner endeavored to fraudulently take advantage of Packers's inadvertent mistake before the mistake was fully known and understood by Packers. That bad faith conduct of Brenner was not in *Wagner,* but in this case. Brenner was also found by Judge Painter to have testified falsely under oath about whether or not he had paid the *Wagner* reparation judgment, which resulted in the trading ban he violated. That

false statement was in this case, not *Wagner.* Brenner also lied about when he had his conversation with Johnson when Johnson told Brenner what he was going to do about it. That, too, was in this case, not *Wagner.* Under *Precision* the argument can also be made that this kind of improper conduct affects the operation and integrity of the commodities exchange in which the public has substantial interest. As we view this dishonest incident, the public is injured if the wrongdoer is permitted to profit from his wrong as the Commission has directed in its Motion for Summary Disposition. In the administrative enforcement action the Commission itself alleges that Brenner's trading ban violation "is directly related to the integrity of the market and the Commission's ability to police the marketplace effectively." We agree, except the Commission seems to view that conduct in isolation, not in the context of the whole case.

If the Commission wants to punish Johnson or Packers for his improper self-help, it would seem fairer if the Commission had also brought an administrative enforcement action against Johnson. That possibly would have penalized Johnson for his self-help even though in Johnson's view he was only taking back from Brenner what was rightfully his. We understand Johnson's type of self-help is not to be approved, but what the Commission has done here upsets any concept of an equitable resolution between the parties. The Commission has chosen to reward the principal culprit at the expense of the other party. At least Johnson did not appear to have been deceitful. He told Brenner what he was going to do and why if Brenner did not accept the offered compromise.

In summary, this case deserves to be reversed on the alter-ego theory, on the application of the unclean hands doctrine, because of Brenner's false testimony before the administrative law judge, and because of the harm to the integrity to the market. This situation, if uncorrected, could not help but .harm the market and undermine confidence in the Commission. This may not be the best overall solution considering that Packers and Johnson may also have committed a wrong, though of lesser degree than Brenner, but in view of the way the case was handled by the Commission we see no way for this court to even it out now. That would require the expertise of the Commission. No amount of Commission expertise, however, can make wrong look like right. We decline to enforce the Commission's resolution of the problem, and we reverse.

REVERSED.