In the

# United States Court of Appeals

## For the Seventh Circuit

No. 01-2466

PETER SCHEIBER,

*Plaintiff-Appellant,*

v.

DOLBY LABORATORIES, INC., and DOLBY LABORATORIES
  LICENSING CORP.,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Southern District of Indiana, Indianapolis Division.
No. 95 C 1531—**John P. Godich**, *Magistrate Judge.*

ARGUED DECEMBER 3, 2001—DECIDED JUNE 17, 2002

Before POSNER, EVANS, and WILLIAMS, *Circuit Judges.*

POSNER, *Circuit Judge.* The plaintiff in a suit to enforce
a patent licensing agreement appeals to us from the grant of
summary judgment to the defendants, Dolby for short.
Scheiber, the plaintiff, a musician turned inventor who held
U.S. and Canadian patents on the audio system known
as "surround sound," sued Dolby in 1983 for infringement
of his patents. The parties settled the suit by agreeing that
Scheiber would license his patents to Dolby in exchange for
royalties. The last U.S. patent covered by the agreement was
scheduled to expire in May 1993, while the last Canadian

patent was not scheduled to expire until September 1995. During the settlement negotiations Dolby suggested to Scheiber that in exchange for a lower royalty rate the license agreement provide that royalties on all the patents would continue until the Canadian patent expired, including, therefore, patents that had already expired. That way Dolby could, it hoped, pass on the entire royalty expense to its sublicensees without their balking at the rate. Scheiber acceded to the suggestion and the agreement was drafted accordingly, but Dolby later refused to pay royalties on any patent after it expired, precipitating this suit. Federal jurisdiction over the suit is based on diversity of citizenship, because a suit to enforce a patent licensing agreement does not arise under federal patent law. E.g., *Jim Arnold Corp. v. Hydrotech Systems, Inc.*, 109 F.3d 1567, 1575 (Fed. Cir. 1997). The presence of a federal defense (here, patent misuse) is irrelevant to jurisdiction. *Christianson v. Colt Industries Operating Corp.*, 486 U.S. 800 (1988).

Dolby argues that the duty to pay royalties on any patent covered by the agreement expired by the terms of the agreement itself as soon as the patent expired, because the royalties were to be based on Dolby's sales of equipment within the scope of the patents and once a patent expires, Dolby argues, there is no equipment within its scope. The argument would make meaningless the provision that Dolby itself proposed for continuing the payment of royalties until the last patent expired. Anyway the reference to equipment within the scope of the patent was clearly meant to *identify* the equipment on which royalties would be based (Dolby makes equipment that does not utilize Scheiber's patents as well as equipment that does) rather than to limit the duration of the obligation to pay royalties.

Dolby's principal argument is that the Supreme Court held in a decision that has never been overruled that a pat-

ent owner may not enforce a contract for the payment of patent royalties beyond the expiration date of the patent. The decision was *Brulotte v. Thys Co.*, 379 U.S. 29 (1964), dutifully followed by lower courts, including our own, in such cases as *Meehan v. PPG Industries, Inc.*, 802 F.2d 881, 883 (7th Cir. 1986); *Virginia Panel Corp. v. MAC Panel Co.*, 133 F.3d 860, 869 (Fed. Cir. 1997), and *Boggild v. Kenner Products*, 776 F.2d 1315, 1318-19 (6th Cir. 1985). *Brulotte* involved an agreement licensing patents that expired at different dates, just like this case; the two cases are indistinguishable. The decision has, it is true, been severely, and as it seems to us, with all due respect, justly, criticized, beginning with Justice Harlan's dissent, 379 U.S. at 34, and continuing with our opinion in *USM Corp. v. SPS Technologies, Inc.*, 694 F.2d 505, 510-11 (7th Cir. 1982). The Supreme Court's majority opinion reasoned that by extracting a promise to continue paying royalties after expiration of the patent, the patentee extends the patent beyond the term fixed in the patent statute and therefore in violation of the law. That is not true. After the patent expires, anyone can make the patented process or product without being guilty of patent infringement. The patent can no longer be used to exclude anybody from such production. Expiration thus accomplishes what it is supposed to accomplish. For a licensee in accordance with a provision in the license agreement to go on paying royalties after the patent expires does not extend the duration of the patent either technically or practically, because, as this case demonstrates, if the licensee agrees to continue paying royalties after the patent expires the royalty rate will be lower. The duration of the patent fixes the limit of the patentee's power to extract royalties; it is a detail whether he extracts them at a higher rate over a shorter period of time or a lower rate over a longer period of time.

This insight is not original with us. "The Brulotte rule incorrectly assumes that a patent license has significance after the patent terminates. When the patent term ends, the

exclusive right to make, use or sell the licensed invention
also ends. Because the invention is available to the world,
the license in fact ceases to have value. Presumably, li-
censees know this when they enter into a licensing agree-
ment. If the licensing agreement calls for royalty payments
beyond the patent term, the parties base those payments on
the licensees' assessment of the value of the license during
the patent period. These payments, therefore, do not rep-
resent an extension in time of the patent monopoly . . . .
Courts do not remove the obligation of the consignee to pay
because payment after receipt is an extension of market
power—it is simply a division of the payment-for-delivery
transaction. Royalties beyond the patent term are no dif-
ferent. If royalties are calculated on post-patent term sales,
the calculation is simply a risk-shifting credit arrangement
between patentee and licensee. The arrangement can be
no more than that, because the patentee at that time has
nothing else to sell." Harold See & Frank M. Caprio, "The
Trouble with *Brulotte*: the Patent Royalty Term and Patent
Monopoly Extension," 1990 *Utah L. Rev.* 813, 814, 851; to
similar effect see Rochelle Cooper Dreyfuss, "Dethroning
*Lear*: Licensee Estoppel and the Incentive to Innovate," 72
*Va. L. Rev.* 677, 709-12 (1986). "[T]he Supreme Court refused
to see that typically such post-expiration royalties mere-
ly amortize the price of using patented technology." 10 Phil-
lip E. Areeda *et al.*, *Antitrust Law* §§ 1782c2-c3, pp. 505-11
(1996); cf. *Jahn v. 1-800-FLOWERS.com, Inc.*, 284 F.3d 807,
811-12 (7th Cir. 2002).

These criticisms might be wide of the mark if *Brulotte* had
been based on the interpretation of the patent clause of the
Constitution, or of the patent statute or any other stat-
ute; but it seems rather to have been a free-floating prod-
uct of a misplaced fear of monopoly ("a patentee's use of a
royalty agreement that projects beyond the expiration date
of the patent is unlawful *per se*. If that device were available
to patentees, the free market visualized for the post-expira-

tion period would be subject to monopoly influences that have no proper place there," 379 U.S. at 32-33) that was not even tied to one of the antitrust statutes. 10 Areeda *et al.*, *supra*, at §§ 1782c2, 1782c3, pp. 505, 511. The doctrinal basis of the decision was the doctrine of patent misuse, of which more later.

A patent confers a monopoly, and the longer the term of the patent the greater the monopoly. The limitation of the term of a patent, besides being commanded by the Constitution, see U.S. Const. art. I, § 8, cl. 8; *Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*, 489 U.S. 141, 146 (1989), and necessary to avoid impossible tracing problems (imagine if some caveman had gotten a perpetual patent on the wheel), serves to limit the monopoly power conferred on the patentee. But as we have pointed out, charging royalties beyond the term of the patent does not lengthen the patentee's monopoly; it merely alters the timing of royalty payments. This would be obvious if the license agreement between Scheiber and Dolby had become effective a month before the last patent expired. The parties could have agreed that Dolby would pay royalties for the next 100 years, but obviously the royalty rate would be minuscule because of the imminence of the patent's expiration.

However, we have no authority to overrule a Supreme Court decision no matter how dubious its reasoning strikes us, or even how out of touch with the Supreme Court's current thinking the decision seems. In *Agostini v. Felton*, 521 U.S. 203, 237 (1997), the Supreme Court "reaffirm[ed] that '[i]f a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions,'" quoting *Rodriguez de Quijas v. Shearson/American Express, Inc.*, 490 U.S. 477,

484 (1989); see also *State Oil Co. v. Khan*, 522 U.S. 3, 20 (1997); *Sasnett v. Litscher*, 197 F.3d 290, 292 (7th Cir. 1999); *National Foreign Trade Council v. Natsios*, 181 F.3d 38, 58 (1st Cir. 1999), aff'd under the name *Crosby v. National Foreign Trade Council*, 530 U.S. 363 (2000) ("scholarly debate about the continuing viability of a Supreme Court opinion does not, of course, excuse the lower federal courts from applying that opinion"). In *Khan*, the lower court (namely us), pointing out that the Supreme Court decision that we refused to declare defunct was clearly out of touch with the Court's current antitrust thinking, invited the Court to reverse, see *Khan v. State Oil Co.*, 93 F.3d 1358, 1363 (7th Cir. 1996), vacated and remanded 522 U.S. 3 (1997), and it did, but pointedly noted that we had been right to leave the execution and interment of the Court's discredited precedent to the Court. *Id.* at 20.

In *Aronson v. Quick Point Pencil Co.*, 440 U.S. 257 (1979), a case decided some years after *Brulotte*, the Supreme Court upheld a superficially similar arrangement: a patent applicant granted a license for the invention it hoped to patent to a firm that agreed, if a patent were not granted, to pay the inventor-applicant royalties for as long as the firm sold products embodying the invention. The Court was careful to distinguish *Brulotte*, and not a single Justice suggested that any cloud had been cast over the earlier decision. Since no patent was granted, the doctrine of patent misuse could not be brought into play, and there was no other federal ground for invalidating the license. The Court emphasized that *Brulotte* had been based on the "leverage" that the patent had granted the patentee to extract royalties beyond the date of expiration, 440 U.S. at 265, and that leverage was of course missing in *Aronson*.

If *Aronson* and *Brulotte* were inconsistent with each other and the Court had not reaffirmed *Brulotte* in *Aronson*, then we would have to follow *Aronson*, the later opinion, since to

follow *Brulotte* in those circumstances would be to over-rule *Aronson*. But the reaffirmation of *Brulotte* in *Aronson* tells us that the Court did not deem the cases inconsistent, and so, whether we agree or not, we have no warrant for declaring *Brulotte* overruled.

Scheiber argues further, however, that *Brulotte* has been superseded by a 1988 amendment to the patent statute which provides, so far as bears on this case, that "no patent owner otherwise entitled to relief for infringement . . . shall be . . . deemed guilty of misuse or illegal extension of the patent right by reason of his having . . . conditioned the license of any rights to the patent or the sale of the patented product on the acquisition of a license to rights in another patent or purchase of a separate product" unless the patent-ee has market power in the market for the conditioning product (which is not argued here). 35 U.S.C. § 271(d)(5). The statute is doubly inapplicable to this case. It merely limits defenses to infringement suits, and Scheiber isn't suing for infringement; he's suing to enforce a license agree-ment. He can't sue for infringement; his patents have expired. Scheiber argues that since the agreement was in settlement of his infringement suit, the only effect of limiting the statute to such suits would be to dissuade patentees from settling them. Not so. Had Scheiber pressed his 1983 infringement suit against Dolby to judgment, he would not have obtained royalties beyond the expiration date of his patents, because Dolby had not as yet agreed to pay any royalties; there was no license agreement before the case was settled. The significance of the statute is that if some subsequent infringer should point to the license agreement with Dolby as a misuse of Scheiber's patent by reason of the tying together of different patents, Scheiber could plead the statute as a bar to the infringer's defense of patent misuse.

   In any event the new statutory defense is explicitly limited to tying, *Lasercomb America, Inc. v. Reynolds*, 911 F.2d 970, 976 and n. 15 (4th Cir. 1990); *In re Recombinant DNA Technology Patent & Contract Litigation*, 850 F. Supp. 769, 775-77 (S.D. Ind. 1994), normally of a nonpatented product to a patented product, as in a number of famous patent misuse cases, such as *Henry v. A.B. Dick Co.*, 224 U.S. 1 (1912), and antitrust tying cases, such as *International Business Machines Corp. v. United States*, 298 U.S. 131 (1936); *Morton Salt Co. v. G.S. Suppiger Co.*, 314 U.S. 488 (1942), and *International Salt Co. v. United States*, 332 U.S. 392 (1947). The 1988 amendment limited the tying doctrine, in cases in which the tying product is a patent, to situations in which the patentee has real market power, not merely the technical monopoly (right to exclude) that every patent confers. *Virginia Panel Corp. v. MAC Panel Co., supra*, 133 F.3d at 869. There are multiple products here, and they are tied together in the sense of having been licensed as a package. The more exact term is bundling, because a single price is charged for the tied goods, rather than separate prices as in the canonical tying cases. *United States v. Microsoft Corp.*, 253 F.3d 34, 87, 96 (D.C. Cir. 2001) (en banc) (per curiam); *Multistate Legal Studies, Inc. v. Harcourt Brace Jovanovich Legal & Professional Publications, Inc.*, 63 F.3d 1540, 1548 (10th Cir. 1995). We may assume that the statute encompasses bundling. We can't find a case on the point, but certainly the statutory language encompasses it and the objections to tying and bundling, such as they are, are the same. (The naive objection is that they extend monopoly; the sophisticated objection is that they facilitate price discrimination.) But it is not the bundling of the U.S. and Canadian patents on which Dolby pitches its refusal to pay royalties; it is the duration of the royalty obligation. The objection would be the same if there were a single patent and the agreement required the licensee to continue paying royalties after the patent expired.

*Brulotte* called extending the royalty obligation beyond the term of the patent analogous to tying, 379 U.S. at 33, because the traditional objection to tying as we noted is that by telling the buyer that he can't buy the tying product unless he agrees to buy a separate product from the seller as well, the seller is trying to "lever" or "extend" his monopoly to the market for that separate product: only extending it in product space rather than in time. Yet if the seller tries to charge a monopoly price for that separate product, the buyer will not be willing to pay as much for the tying product as he would if the separate product, which he has to buy also, were priced at a lower rate. Acquiring monopoly power in the tied-product market comes at the expense of losing it in the tying-product market. *Advo, Inc. v. Philadelphia Newspapers, Inc.*, 51 F.3d 1191, 1202-03 (3d Cir. 1995); *Hirsh v. Martindale-Hubbell, Inc.*, 674 F.2d 1343, 1349 n. 19 (9th Cir. 1982). Thus, as these cases and a tidal wave of legal and economic scholarship point out, the idea that you can use tying to lever your way to a second (or, in the post-expiration patent royalty setting, a longer and therefore greater) monopoly is economic nonsense, imputing systematic irrationality to businessmen. Congress seems to have recognized this in the 1988 amendment. But even if the amendment should therefore be interpreted to reject the rationale of the tying cases, and even though the rationale of *Brulotte* is materially identical to that of the discredited tying cases—the Court even invoked "leverage" (as it emphasized later in *Aronson*), saying that to "use that leverage [the power conferred by the monopoly] to project those royalty payments beyond the life of the patent is analogous to an effort to enlarge the monopoly of the patent," 379 U.S. at 33—and not a whit stronger (probably even weaker, since there is only one product), it would not follow that the statute had changed the rule of that case. Congress isn't constrained, as courts like to think *they* are, to rule logically.

Most statutes are the product of compromise, and compromises need not cut at the logical joints of a controversy. There just is no evidence that Congress in the 1988 amendment wanted to go or did go beyond tying. Had it wanted to, it would have chosen different words. We are not literalists, but there must be *some* semantic handle on which to hang a proposed statutory interpretation, and there is none here, though we have found a district court case that did hold that the 1988 amendment had overruled *Brulotte*: *Sunrise Medical HHG, Inc. v. AirSep Corp.*, 95 F. Supp. 2d 348, 457-59 (W.D. Pa. 2000).

Scheiber has another ground for disregarding *Brulotte* that deserves consideration (again a ground supported by a lone district court decision, *A.C. Aukerman Co. v. R.L. Chaides Construction Co.*, No. CIV. 88-20704 SW, 1993 WL 379548, at *6 (N.D. Cal. Sept. 13, 1993), but one that misreads *Brulotte* as having been held in *Well Surveys, Inc. v. Perfo-Log, Inc.*, 396 F.2d 15, 17 (10th Cir. 1968), to be inapplicable to package-licensing agreements that contain expired patents unless the licensees were coerced into making the agreements). The ground is that Dolby comes into court with "unclean hands" that should not be allowed to touch and stain the Supreme Court's decision. Scheiber points out that it was Dolby that asked him to stretch out the royalties until the last patent expired and that now seeks to get out of the obligation it not only accepted but volunteered to shoulder.

The doctrine of "unclean hands"—colorfully named, equitable in origin, and reflecting, in its name at least, the moralistic background of equity in the decrees of the clerics who filled the office of lord chancellor of England during the middle ages, *Shondel v. McDermott*, 775 F.2d 859, 867 (7th Cir. 1985); 1 Dan B. Dobbs, *Law of Remedies* § 2.4(2), pp. 92-93 (2d ed. 1993)—nowadays just means that equitable relief will be refused if it would give the plaintiff

a wrongful gain. See, e.g., *Packers Trading Co. v. CFTC*, 972 F.2d 144, 148-49 (7th Cir. 1992); *United States v. Bob Stofer Oldsmobile-Cadillac, Inc.*, 853 F.2d 1392, 1398-99 (7th Cir. 1988); *Adler v. Federal Republic of Nigeria*, 219 F.3d 869, 871, 876-77 (9th Cir. 2000). "Today, 'unclean hands' really just means that in equity as in law the plaintiff's fault, like the defendant's, is relevant to the question of what if any remedy the plaintiff is entitled to. An obviously sensible application of this principle is to withhold an equitable remedy that would encourage or reward (and thereby encourage) illegal activity . . . . In what may have been the earliest application of the principle of unclean hands, a highwayman was refused an accounting against his partner in crime (and later hanged, to boot, along with the partner)." *Shondel v. McDermott, supra*, 775 F.2d at 868 (citations omitted). That is an apt description of the relief (in effect a partial rescission of the license agreement, and so equitable in character) sought by Dolby. But unfortunately for Scheiber it is an apt description of almost any case in which a party to a contract seeks relief on the basis that the contract is illegal. Dolby is in effect a private attorney general, charged by *Brulotte* with preventing Scheiber from seeking to "extend" his patent and being rewarded for this service to the law by getting out of a freely negotiated royalty obligation.

The obvious problem is that Dolby is not seeking equitable relief; it just doesn't want to pay what it owes Scheiber under their licensing agreement on the ground that the agreement, or at least so much of it as creates the duty to pay that Dolby is flouting, is unlawful and therefore unenforceable. That is how the Court put it in *Brulotte v. Thys Co., supra*, 379 U.S. at 33-34. The effect is the same as rescission but that is true in any case where the payee in a contract is allowed to refuse payment because the contract is unenforceable. Scheiber is the plaintiff, seeking damages, and Dolby is pleading the defense of illegality to contract

enforcement. See, e.g., *Kaiser Steel Corp. v. Mullins*, 455 U.S. 72, 77-83 (1982); *Northern Indiana Public Service Co. v. Carbon County Coal Co.*, 799 F.2d 265, 272 (7th Cir. 1986). In contrast, the remedy sought in the highwayman's case, an accounting, is an equitable remedy. But as if this weren't complicated enough, patent misuse—the doctrine applied in *Brulotte* and invoked here by Dolby—is an equitable defense, and unclean hands can be asserted in opposition to an equitable defense as well as being assertible as a defense to a claim for equitable relief. *Alcatel USA, Inc. v. DGI Technologies, Inc.*, 166 F.3d 772, 794 and n. 92 (5th Cir. 1999); *Conan Properties, Inc. v. Conans Pizza, Inc.*, 752 F.2d 145, 150 (5th Cir. 1985). The "theory" that makes this possible is that before the joinder of law and equity, an equitable defense to a legal claim had to be asserted in a separate proceeding in equity, in which the plaintiff in the law case would be the defendant and so could plead the defense of unclean hands against the law defendant-equity plaintiff. *United Cities Gas Co. v. Brock Exploration Co.*, 995 F. Supp. 1284, 1296 n. 11 (D. Kan. 1998).

We needn't get deeper into this thicket of archaic distinctions, since it is apparent that to apply the doctrine of unclean hands in a case such as the present one would fatally undermine the policy of refusing enforcement to contracts for the payment of patent royalties after expiration of the patent. It would be (given the antimonopoly basis of *Brulotte*) inconsistent with the Supreme Court's rejection of the defense of *in pari delicto* ("equally at fault") in antitrust cases, *Perma Life Mufflers, Inc. v. International Parts Corp.*, 392 U.S. 134, 137-39 (1968), since the effect of that rejection is to give a party to a contract that violates the antitrust laws a defense to a suit to enforce the contract even if he entered into the contract with full knowledge. We even said in *General Leaseways, Inc. v. National Truck Leasing Ass'n*, 744 F.2d 588, 597 (7th Cir. 1984), in words that might have been

uttered with the present case in mind, that "ever since the Supreme Court, in *Perma Life*, rejected the defense of *in pari delicto* in antitrust cases, it has been clear that whenever some maxim of equity (such as that to get equitable relief you must have 'clean hands') collides with the objectives of the antitrust laws, the equity maxim must give way." Later the Supreme Court equated "unclean hands" to *in pari delicto. McKennon v. Nashville Banner Publishing Co.*, 513 U.S. 352, 360 (1995); see also *Hartman Bros. Heating & Air Conditioning, Inc. v. NLRB*, 280 F.3d 1110, 1116 (7th Cir. 2002).

What is true is that a contract that is voided on grounds of illegality—Dolby's defense to Scheiber's suit for the agreed-upon royalties—is ordinarily treated as rescinded, meaning that the parties are to be put back, so far as possible, in the positions they would have occupied had the contract never been made in the first place. *Cox v. Zale Delaware, Inc.*, 239 F.3d 910, 914 (7th Cir. 2001); *United States v. Amdahl Corp.*, 786 F.2d 387, 392-93 (Fed. Cir. 1986). For example, even if a contract is unenforceable because it violates the statute of frauds, the performing party can still claim the value of his performance, net of any payment received before the contract was rescinded, on a theory of *quantum meruit*, a type of restitution. See, e.g., *Clark v. United States*, 95 U.S. 539, 541-42 (1877); *Beanstalk Group, Inc. v. AM General Corp.*, 283 F.3d 856, 863-64 (7th Cir. 2002). *Cox* and *Amdahl* involved contracts that were illegal, and not just unenforceable (there is nothing remotely "wrongful" about failing to memorialize in writing a contract that is enforceable only if so memorialized), yet *quantum meruit* would still have been available had the voiding party been unduly enriched by being able to walk away from the contract. But Scheiber is not arguing that if indeed the contract is unenforceable, as we believe it is, he is entitled to some form of restitution of the benefits received by Dolby under it as a result of Dolby's being allowed to use Scheiber's patents

without paying the full price that they had agreed upon. Scheiber would be entitled to such relief only if the amount of royalties that Dolby did pay was less than the fair market value of Dolby's use of the patents, which of course it may not have been. In any event he makes no claim of *quantum meruit*.

  Dolby was indeed entitled to summary judgment.

AFFIRMED.

A true Copy:

  Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*