WYNN, Circuit Judge,
dissenting:
A unanimous Supreme Court told us in no uncertain terms that prisoners have a liberty interest in avoiding indefinite, highly restrictive imprisonment. Wilkinson v. Austin, 545 U.S. 209, 220-21, 125 S.Ct. 2384, 162 L.Ed.2d 174 (2005). And the Supreme Court told us that in determining whether such a liberty interest exists, we must focus on the “the nature of those conditions themselves in relation to the ordinary incidents of prison life.” Id. at 223, 125 S.Ct. 2384 (quotation marks omitted).
The Supreme Court found the conditions in Wilkinson sufficiently egregious that “taken together[,J they impose an atypical and significant hardship within the correctional context ... [and thereby] give rise to a liberty interest in their avoidance.” Id. at 224, 125 S.Ct. 2384. In other words, the restrictive conditions could be imposed-but not without procedural safeguards such as notice and an opportunity to be heard.
This case presents conditions of confinement strikingly similar to, and arguably more egregious than, those in Wilkinson. I would therefore follow Wilkinson and find Plaintiff Alfred Prieto entitled to at least some modicum of procedural due process. In my view, the majority opinion reads Wilkinson unnecessarily narrowly in signing off on Prieto’s automatic, permanent, and unreviewable placement in the *256 highly restrictive conditions of Virginia’s death row. Accordingly, I respectfully dissent.
I.
A.
“The Fourteenth Amendment’s Due Process Clause protects persons against deprivations of life, liberty, or property; and those who seek to invoke its procedural protection must establish that one of these interests is at stake.” Id. at 221, 125 S.Ct. 2884.
In Wilkinson, the Supreme Court found a prisoner’s liberty interest at stake and got there by noting that “the touchstone of the inquiry into the existence of’ the liberty interest in avoiding restrictive conditions of confinement was not the language of regulations “but the nature of those conditions themselves in relation to the ordinary incidents of prison life.” 545 U.S. at 222, 125 S.Ct. 2384 (citation and quotation marks omitted). The centerpiece of the Court’s Wilkinson opinion, therefore, was an analysis of the conditions themselves.
Nowhere in Wilkinson did the Supreme Court parse the language of any law or regulation or otherwise suggest that written words governing the conditions of confinement are the linchpins to finding a liberty interest. See id. Instead, the Court analyzed the conditions themselves and then held that “taken together they impose an atypical and significant hardship within the correctional context. It follows that [the prisoners] have a liberty interest in avoiding” them. Id. at 224, 125 S.Ct. 2384. In other words, the Supreme Court looked not at verbiage but at the facts on the ground, comparing the conditions at issue with typical conditions. And finding the conditions at issue atypically harsh, the Court held that a prisoner subjected to the conditions is due at least an informal notice and hearing before he is subjected to them.[1]
Several conditions caught the Supreme Court’s eye in Wilkinson: the solitary nature of the confinement and near complete prohibition on human contact; the lack of stimuli, with exercise limited to one hour per day in a small indoor room; the potentially indefinite period of the placement-with only an annual review after the initial thirty-day review; and potential disqualification of inmates otherwise eligible for parole. See Wilkinson, 545 U.S. at 223-24, 125 S.Ct. 2384. The Supreme Court looked at the totality of the conditions and held that “taken together they impose an atypical and significant hardship within the correctional context.” Id. at 224, 125 S.Ct. 2384.
In this case, the conditions of confinement essentially mirror those in Wilkinson. Prieto is deprived of almost all human contact, even cell-to-cell contact with other death row inmates. His conditions of confinement are largely devoid of stimuli: He must remain in his small single cell for twenty-three hours a day, except for one hour five days per week, when he may exercise in a small enclosure with a concrete floor and no exercise equipment. And Prieto’s confinement on death row is indefinite: No opportunity for review of the placement exists.
In some respects, Prieto’s conditions are actually more restrictive than those in Wilkinson. For example, Prieto’s cell is smaller than the cells in Wilkinson. Unlike the prisoners in Wilkinson, Prieto has *257 no opportunity for group programming or religious services. And Prieto has fewer opportunities for exercise.
One condition at issue in Wilkinson but absent here is disqualification for parole. Specifically, inmates otherwise eligible for parole became ineligible when placed into the restrictive supermax confinement at issue in Wilkinson, 545 U.S. at 224, 125 S.Ct. 2384. But the Supreme Court in no way limited its holding only to those (few) inmates who would otherwise be eligible for parole but for their supermax confinement. And I agree with the Seventh Circuit that any contention that Wilkinson turned on the (in)eligibility for parole constitutes “far too crabbed a reading of the decision.” Westefer v. Snyder, 422 F.3d 570, 590 (7th Cir.2005).
In the end, the Supreme Court felt “satisfied” that the conditions in Wilkinson, taken together, “imposefd] an atypical and significant hardship under any plausible baseline.” Wilkinson, 545 U.S. at 223, 125 S.Ct. 2384 (emphasis added). The Supreme Court therefore felt no need to identify the baseline to which the conditions should be compared. Id.
Here, I feel “satisfied” that Prieto’s conditions of confinement, which are strikingly similar to those in Wilkinson, when taken together “impose[] an atypical and significant hardship under any plausible baseline.” Id. And if the Supreme Court did not need to identify a particular baseline to reach such a conclusion, neither do I.
B.
In my view, the majority opinion seeks to engage in just the sort of “parsing” that the Supreme Court moved away from with Sandin and Wilkinson. For example, the majority opinion understands Sandin and Wilkinson as holding that a prisoner must first show that a written prison regulation gives rise to a protected liberty interest before reaching the atypical and significant hardship inquiry. See ante at 248-52. But following that logic to its end would mean that prisoners have no interest in avoiding even extreme hardships so long as a state simply removes all delineating prison regulations or expressly disclaims any liberty expectation. Yet it was precisely this type of “parsing” and resulting “disincentive^ for States to promulgate procedures for prison management” that the Supreme Court sought to curtail. Wilkinson, 545 U.S. at 222, 125 S.Ct. 2384.
The majority opinion also “re-organizes” the Supreme Court’s Wilkinson analysis in misleading ways. For example, the only “.threshold question” the Supreme Court identified in Wilkinson was whether “the inmates established] a constitutionally protected liberty interest” — not the sentence fragment from a different paragraph that the majority opinion redlines in to play the part of the “threshold question.” 545 U.S. at 221, 125 S.Ct. 2384. A second example: The majority opinion contends that the risk of erroneous placement coupled with the harsh conditions “triggered” due process protections. Ante at 250-51. Yet in Wilkinson, the Supreme Court considered the erroneous placement issue only after it had already held that a liberty interest in avoiding the harsh conditions existed, as a factor for determining whether the procedures in place sufficed. 545 U.S. at 224-25,125 S.Ct. 2384.
The majority opinion places much emphasis on the fact that because all capital offenders in Virginia automatically land on death row, Prieto has no interest in avoiding its conditions and thus no due process rights. See ante at 252. In this respect, too, Prieto’s case overlaps with Wilkinson: The Supreme Court noted that some defendants there were automatically assigned to the restrictive supermax confinement as a consequence of being “convicted of certain offenses.” Wilkinson, 545 U.S. *258 at 216, 125 S.Ct. 2384. But the Supreme Court in no way excluded those inmates from the ambit of its holding or otherwise suggested that because of their automatic assignment, they had no liberty interest in avoiding the restrictive supermax conditions.
Instead, the Supreme Court broadly stated that “the touchstone of the inquiry into the existence of a protected, state-created liberty interest in avoiding restrictive conditions of confinement is not the language of regulations regarding those conditions but the nature of those conditions themselves ‘in relation to the ordinary incidents of prison life.’ ” Id. at 221, 125 S.Ct. 2384 (citation omitted). In my view, the majority opinion’s myopic search of a written regulation betrays this touchstone and “stray[s] from the real concerns undergirding the liberty protected by the Due Process Clause.” Sandin, 515 U.S. at 483, 115 S.Ct. 2293.
I agree with the majority opinion that the Supreme Court has been anything other than consistent in its approach to prisoner due process cases. The Supreme Court suggested that prisoner liberty interests exist whenever something is sufficiently important. See, e.g., Morrissey v. Brewer, 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972). Then it indicated that liberty interests are a function of mandatory verbiage in written regulations. See, e.g., Wolff v. McDonnell, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974). Later the Court rethought that approach, holding that such verbiage is, in fact, not so important after all. See, e.g., Wilkinson, 545 U.S. 209, 125 S.Ct. 2384. It is, therefore, not surprising that lower courts have not found it easy to agree on how best to read the due process tea leaves in the prison context. See ante at 249 (comparing Chappell v. Mandeville, 706 F.3d 1052 (9th Cir.2013), with Tellier v. Fields, 280 F.3d 69 (2d Cir.2000)).
Finally, the majority opinion suggests that an analysis like mine bucks controlling circuit precedent, and particularly Lovelace v. Lee, 472 F.3d 174, 202 (4th Cir.2006). Yet that case does not present the obstacle the majority opinion portrays. In Lovelace, we admonished the district court for its failure to address the plaintiffs due process claim and remanded the matter to the district court for a determination “in the first instance.” 472 F.3d at 203. Therefore, even assuming that one could not square my view with Lovelace, anything Lovelace said about the due process claim seems to be only dictum, and in any event the assertion that the case “reject[ed] [my] approach” is gross overstatement. Ante at 250-51. Moreover, to the extent Lovelace parts ways with Wilkinson, we certainly “have no authority to overrule a Supreme Court decision.” Scheiber v. Dolby Labs., Inc., 293 F.3d 1014, 1018 (7th Cir.2002) (Posner, J.).
In sum, taking the Supreme Court at its word, it told us that we are not to parse written regulations but rather that the “touchstone of the inquiry into the existence of a protected, state-created liberty interest in avoiding restrictive conditions of confinement is not the language of regulations regarding those conditions but the nature of those conditions themselves in relation to the ordinary incidents of prison life.” Wilkinson, 545 U.S. at 223, 125 S.Ct. 2384 (quotation marks omitted). Here, as in the strikingly similar Wilkinson, the conditions are sufficiently egregious that “taken together!, they] impose an atypical and significant hardship within the correctional context” when compared to “any plausible baseline” and thus “give rise to a liberty interest in their avoidance.” Wilkinson, 545 U.S. at 223, 125 S.Ct. 2384.
That being said, there is no necessary tension between the existence of a liberty interest m avoiding restrictive conditions *259 of confinement and, for example, the state’s penological interests or the fact that we are dealing with a prison and not a resort. As the Supreme Court has stated, “harsh conditions may well be necessary and appropriate in light of the danger that high-risk inmates pose both to prison officials and to other prisoners. That necessity, however, does not diminish our conclusion that the conditions give rise to a liberty interest in their avoidance.” Id.
II.
Once a liberty interest is established, the question then becomes what process is due to protect it. To determine whether procedural safeguards sufficed to protect the liberty interest in Wilkinson, the Supreme Court looked to three factors:
“First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government’s interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.”
Id. at 224-25, 125 S.Ct. 2384 (quoting Mathews v. Eldridge, 424 U.S. 319, 335, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976)). Applying those factors, the Supreme Court held that “informal, nonadversary procedures” informing inmates of the factual basis for their restrictive placement, a fair opportunity for rebuttal, and regular review sufficed to comport with due process. Id. at 229, 125 S.Ct. 2384.
Here, any attempt to apply the salient factors would be in vain — because Virginia affords capital offenders no process. Virginia tries to offer up its sentencing procedures as all the due process required. Of course, the same could be said of all prisoners. Yet no Supreme Court case has ever suggested that is so. Further, under such a regime, sentencing discretion could result in two defendants who commit the same crime and possess the same aggravating factors receiving vastly different conditions of confinement and procedural safeguards. The conviction and sentence alone, therefore, do not represent a principled manner for determining due process rights.[2]
At the end of the day, all of this ink is being spilled over whether Virginia needs to provide minimalist procedural safeguards like those in Wilkinson to less than ten prisoners — the current number of inmates on Virginia’s death row. Again, the “harsh conditions may well be necessary and appropriate” for these prisoners. Wilkinson, 545 U.S. at 223, 125 S.Ct. 2384. But that “does not diminish” the conclusion that “the conditions give rise to a liberty interest in their avoidance” — and that all that would be required to comport with due process would be informal notice and an informal opportunity to be heard. Id. at 224, 125 S.Ct. 2384. These procedural safeguards, in my view, Prieto should have.
III.
For the reasons above, I would affirm the district court’s judgment and, accordingly, respectfully dissent.

. The Supreme Court did not, however, hold that the conditions themselves were unconstitutional and needed to be changed; that would be a separate, Eighth Amendment inquiry. Nor would I hold so here, not least because, as in Wilkinson, that is not before us.

. The majority opinion purports that it does "not hold, or even suggest, that differences in the nature of a conviction or the length of a sentence give rise to different liberty interests.” Ante at 254. But allowing Virginia to confine Prieto automatically, based on his death sentence, to highly restrictive conditions for the duration of his incarceration (so far, almost seven years) and without any opportunity for review does just that.